UNITED STATES v. DEBELL et al.

(Circuit Court of Appeals, Eighth Circuit. September 29, 1915.)

No. 4350.

*(Syllabus by the Court.)*

1. PUBLIC LANDS ⚙138— AVOIDANCE OF PATENT—TITLE OF PURCHASER

The title of a bona fide purchaser of land subsequent to the issue of the patent is superior to the equitable claim of the United States to avoid it for fraud or error in the issue of it.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. ⚙138.]

2. EQUITY ⚙138—COMPLAINT—PRAYER IN ALTERNATIVE FOR INCONSISTENT RELIEF.

It is not a valid objection to a complaint in equity, or to a grant of the relief warranted by the proof, that the plaintiff prayed, in the alternative, for inconsistent relief as for the avoidance for fraud or error of a patent to and a deed of his property, and if, on account of the bona fide purchase of it by another in reliance upon the patent and deed, that relief should be impossible, for the value or the proceeds of the property.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 319–321; Dec. Dig. ⚙138.]

3. INDIANS ⚙27—INDIAN LANDS—SUIT TO SET ASIDE PATENT AND DEED—PARTIES.

The United States may maintain a suit in equity to set aside for fraud or error of law a patent in fee simple under Act May 8, 1906, c. 2348, 34 Stat. 182, 183, and a deed by the Indian allottee, whereby the restriction upon the alienation of the land of the Indian under the care of the United States is violated or evaded, and the Indian is not a necessary party to such a suit.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. ⚙27.]

4. INDIANS ⚙15—INDIAN LANDS—ALIENATION—COMPETENCY OF ALLOTTEE— "INCOMPETENT AND INCAPABLE."

An Indian 77 years of age, who has never had any property except that issued to him by the United States, who has never had any business or experience in selling land or disposing of the proceeds thereof, or in handling any other property except that issued to him by the government, who has no property except 320 acres of land held by the United States in trust for him, without power in him to convey it, who has drawn his monthly rations from the government for 20 years and is still doing so, who is an old-style Indian, who cannot read, or write, or speak the English language, cannot count money, and does not know how many cents there are in a dollar, is "incompetent and incapable" to manage his own affairs within the meaning of the first proviso of the amended section in Act May 8, 1906, c. 2348, 34 Stat. 182, 183, and especially is he

⚙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

incompetent to sell and convey his land and manage and dispose of the proceeds thereof.

It is indispensable to that competency and capability to manage his affairs which conditions the right of the secretary to issue a patent in fee simple to an Indian under this proviso that he shall at least have sufficient ability, knowledge, experience, and judgment to enable him to conduct the negotiations for the sale of his land, and to care for, manage, invest, or dispose of its proceeds with such a reasonable degree of prudence and wisdom as will be likely to prevent him from losing the benefit of his property or its proceeds.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 29, 34, 37–44; Dec. Dig. &15.

For other definitions, see Words and Phrases, First and Second Series, Incompetent.]

5. PUBLIC LANDS &109—ISSUANCE OF PATENT—QUESTION OF FACT—EQUITABLE RELIEF.

Whether or not there is, at the close of a final trial or hearing before the Secretary of the Interior of a crucial question in reference to the issue of a patent to public lands, any substantial evidence to sustain a claim or a finding of fact determinative of the issue is in his, and in every judicial and quasi judicial, tribunal a question of law, and an injurious error of the Secretary in finally deciding that question presents good cause for relief in a court of equity.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 307; Dec. Dig. &109.]

6. INDIANS &15, 27—INDIAN LANDS—PATENT AND DEED—AVOIDANCE IN EQUITY—RELIEF.

One who, with knowledge of the incompetency of an Indian for whom the United States holds his land in trust, without the power in him to alienate it, induces him to sell the land to himself and apply for and obtain a patent in fee simple for it, and then to convey it to him, wrongfully appropriates the land to himself, becomes a trustee de son tort thereof and of its proceeds for the benefit of the Indian, and the United States may maintain a suit in equity to set aside, as against him, the patent and the deed, and in case the title has passed to an innocent subsequent purchaser, to recover of the appropriator the amount he realized from the land above the amount he paid for it to the Indian.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 19, 20, 29, 34, 37–44; Dec. Dig. &15, 27.]

Appeal from the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

Suit in equity by the United States of America against E. J. Debell and another. From a decree for defendants, plaintiff appeals. Reversed and remanded, with directions.

See, also, 227 Fed. 771, —— C. C. A. ——; 227 Fed. 775, —— C. C. A. ——.

E. W. Fiske, Asst. U. S. Atty., of Sioux Falls, S. D. (Robert P. Stewart, U. S. Atty., of Deadwood, S. D., and George Philip, Asst. U. S. Atty., of Sioux Falls, S. D., on the brief), for the United States.

William G. Porter, of Aberdeen, S. D. (E. L. Grantham, of Aberdeen, S. D., and Maurice Rose, of Minneapolis, Minn., on the brief), for appellee Debell.

Charles P. Bates, of Sioux Falls, S. D. (William A. Schumacher and Rexford M. Sheild, both of Sioux Falls, S. D., on the brief), for appellee Butterfield.

Before SANBORN and CARLAND, Circuit Judges, and LEWIS, District Judge.

SANBORN, Circuit Judge. The United States appeals from a decree of dismissal of its suit in equity against E. J. Debell and W. H. Butterfield to avoid a patent dated February 24, 1908, to Pehinji, a Rosebud Sioux Indian of the full blood, for a tract of 320 acres of land which had been allotted to, and was on February 24, 1908, held by the United States in trust for, him without power in him to alienate it for 25 years after February 23, 1907, the date of the trust patent to him of his allotment of this land, and to avoid Pehinji's deed of the land to Debell on March 17, 1908, and Debell's deed of the same to Butterfield of July 27, 1908. The patent of February 24, 1908, was issued under this provision of Act of May 8, 1906, c. 2348, 34 Stat. 182, 183:

"Provided, that the Secretary of the Interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent."

The ground of the relief sought, which is set forth in the complaint, is that Pehinji was incompetent and incapable of managing his own affairs, that Debell, who was the licensed Indian trader at the agency for the Rosebud band of Indians, of which Pehinji was a member, W. C. Courtis, the manager of Debell's store at the agency, and Edward B. Kelley, the United States Indian agent and superintendent of the Rosebud Indian Reservation of the Rosebud band of Indians and of Pehinji, knew this fact, but in order to enable Debell to purchase Pehinji's land at less than its value, they colluded to cause Kelley to represent, and to induce the Secretary of the Interior to believe, that Pehinji was competent and capable of managing his own affairs, and to issue to him his patent in fee simple, that Debell then bought the land of Pehinji for $2,000, when it was worth much more, and obtained a deed from him therefor dated March 17, 1908, and that on July 27, 1908, Debell sold and conveyed this land to Butterfield, who knew all the facts alleged, for the sum of $3,200. In their answers Debell and Butterfield denied the incompetence of Pehinji, the collusion between Debell, Courtis, and Kelley; the misrepresentation to the Secretary regarding the competency of the Indian; that the land was worth more than $2,000 when Debell purchased it; and Butterfield alleged that he bought and paid $3,200 for it in reliance upon the patent in fee simple and the deed to Debell, without any notice of any of the alleged facts pleaded in the complaint in derogation of Debell's title. Upon the issues of the competency of Pehinji, the collusion of Debell, Courtis, and Kelley, the inducement and purpose of the representation of his competency to the Secretary by Kelley, the evidence was conflicting, but it was conclusive that Butterfield purchased the land of Debell and paid $3,200 for it in good faith in reliance upon the patent in fee simple to Pehinji, and upon the latter's

deed to Debell, and this fact is fatal to the claim to avoid that patent and deed as against Butterfield.

[1] The United States by its acts of Congress empowered the Secretary of the Interior to consider and determine whether or not Pehinji was competent and capable to manage his own affairs, and, empowered him, if he found that he was so competent, to issue to him a patent in fee simple, and the Congress enacted that if he did so, all restrictions upon the sale and conveyance by Pehinji of this land were thereupon removed. The Secretary so found, and issued the patent. This patent constituted in itself a conveyance of the complete title to the land and an adjudication that all restrictions upon the sale and conveyance thereof by the patentee were removed. In reliance upon that grant and adjudication Butterfield purchased and paid for the land, and the United States and all parties claiming through or under it are thereby estopped from assailing the patent or the title under it as against such an innocent purchaser. The title of a bona fide purchaser of land subsequent to the issue of the patent is superior to the equitable claim of the United States to avoid it for fraud or error of law in the issue of it. United States v. Detroit Timber & Lumber Co., 131 Fed. 668, 677, 67 C. C. A. 1, 10; United States v. Detroit Timber & Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499; United States v. Winona & St. Peter R. Co., 15 C. C. A. 96, 109, 67 Fed. 948, 961; Colorado Coal & Iron Co. v. United States, 123 U. S. 307, 313, 8 Sup. Ct. 131, 31 L. Ed. 182; United States v. Burlington, etc., R. Co., 98 U. S. 334, 342, 25 L. Ed. 198; United States v. California & Oregon Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, 37 L. Ed. 354; Wright-Blodgett Co. v. United States, 236 U. S. 397, 402, 403, 35 Sup. Ct. 339, 59 L. Ed. 637. As the United States was estopped from destroying or impairing the patent or the title under it as against Butterfield, the court was right in its dismissal of the suit against him.

[2] But the United States prayed in its complaint that if Butterfield should be found to have been a bona fide purchaser, so that the patent and the deeds could not be avoided as against him, it recover of Debell for the benefit of Pehinji the value of the land, alleged to be $4,000, or that Debell be decreed to hold the consideration received by him from Butterfield in trust for Pehinji, and to pay it to the plaintiff for Pehinji's benefit, and counsel insist that the court below erred because it failed to grant any of this relief. This claim is sturdily opposed by counsel for Debell on the grounds: (1) That the bill is multifarious because Butterfield was not a necessary party to the portion of the relief now sought, but he was a proper and a necessary party to the portion of the relief which has heretofore been considered, and that is sufficient to warrant his joinder; (2) that the claim for conversion and for money had and received are inconsistent, and that the claim for an avoidance of the patent and the deeds and for money had and received are likewise inconsistent, but it is not a fatal objection to the grant of such relief as the court deems just and equitable that the plaintiff in a suit in equity prays in the alternative for inconsistent relief; (3) that courts of equity have no jurisdiction of actions at law, and that actions for money had and received and for

conversion are actions at law, but a plaintiff may maintain a suit in equity against a defendant who without right has conveyed his property, or caused it to be conveyed, to himself, or to a third party, to compel him to reconvey it, or cause it to be reconveyed, and, if he has conveyed it away so that he cannot cause it to be conveyed back, to recover of him the amount he, as trustee de son tort, has received for it, or to recover the value of it, and if a cause of action in equity is established by the proof, and the court of equity is unable effectually to grant the relief first prayed, it may grant one of the other prayers for relief. Telegraph Co. v. Davenport, 97 U. S. 369, 371, 24 L. Ed. 1047; Geyser-Marion Gold Min. Co. v. Stark, 106 Fed. 558, 560, 45 C. C. A. 467, 53 L. R. A. 684.

While it is true that a complainant may not, in a suit in equity, join a cause of action in equity and a cause of action at law, and that where his cause of action in equity fails on the proof he cannot recover damages or moneys that he might have recovered at law, it is also true that where the proof sustains the cause of action in equity, but the defendant has by his course of conduct rendered the appropriate relief first sought ineffective, the chancellor may require him to make compensation for his prevention of that relief. Where the primary relief sought is the restoration of property and the defendant has placed it beyond his and the court's reach, the court may require him to pay the value of the property, or the proceeds he received from it, because the right to this relief inheres in and grows out of the equitable cause of action which the plaintiff has established. Moreover, the right to recover the proceeds springs from the immemorial jurisdiction of courts of equity to enforce trusts. One who by fraud or wrong acquires the property of another thereby becomes a trustee de son tort of that property, and holds it in trust for the owner. If he sells and conveys it the owner may successfully pursue him in equity as trustee for the property, or for the proceeds of it. If, therefore, the proof established the plaintiff's cause of action in equity against the defendant for the restoration of the land, he cannot escape accounting for the proceeds he obtained for the property, or the value thereof, on the ground that he placed the land itself beyond the reach of the court.

[3] Counsel for Debell also contends that the United States was not a proper party plaintiff, and that Pehinji was a necessary party. But this is a suit to set aside for fraud the removal of the restriction on alienation of the land of Pehinji imposed by the United States pursuant to its settled public policy to protect and preserve the property of the Indians, and this case cannot be successfully distinguished from Heckman v. United States, 224 U. S. 413, 432, 436, 437, 439, 445, 32 Sup. Ct. 424, 56 L. Ed. 820, Bowling v. United States, 233 U. S. 528, 534, 34 Sup. Ct. 659, 58 L. Ed. 1080, United States v. Gray, 201 Fed. 291, 293, 294, 119 C. C. A. 529, and United States v. Fitzgerald, 201 Fed. 295–297, 119 C. C. A. 533, where the rule is established that the United States has the capacity to maintain a suit in equity for proper relief in any case in which the restriction upon the alienation of land of an Indian allottee under its care has been transgressed, and that the allottee is not a necessary party to such a suit.

[4-6] Finally, counsel insist that, in view of the decision of the

court below in favor of his client and of the strong presumption of its correctness, the evidence in this case fails to establish the averments that the patent in fee simple was secured and the deed from Pehinji was obtained by the fraud and collusion of Debell, Courtis, and Kelley. The evidence establishes these facts: In 1908 Kelley was the Indian Agent and Superintendent, and Pehinji was an Indian of full blood under his care and supervision. Kelley had been such an agent since 1905, and knew Pehinji, his character, his capacity, his competency, and his situation. Pehinji was 77 years old. The only property he had was the 320 acres in controversy. He could not read, or write, or speak, the English language, his testimony was taken through an interpreter, and the evidence shows that his conversations with various parties which are detailed in the testimony were conducted through an interpreter. He lived with his son about 11 miles from the agency, and drew monthly rations from the government for his support, and had done so for 20 years. Debell had been the licensed Indian trader at the agency for many years. He was well acquainted with Pehinji, knew his character, capacity, and situation. Pehinji testified that Kelley came out where he was living and told him that he had to sell his land; that he could get all the money that was coming to him and put it out at interest; that he could eat off of half of it and let the other half out at interest, and that the part laid out at interest would go on to his children and grandchildren; that some time after this conversation Tod Smith, an employé of Debell, came out where he was living with a wagon, told him that Debell had sent for him—

"that he [Debell] had worked to get this up for you through the lawyer, and if you do not do this, get this up he would—you would have some mishap or something happen to you, or some mishap or something terrible come to you— that something would happen to me, or mishap, or get myself into trouble because he had a hard time to get that thing through, through the lawyer."

Tod Smith brought Pehinji to Debell's store at the agency in the wagon. Pehinji testified that Debell talked to him through an interpreter, and said to him:

"I will help you out and you will eat off the $2,000 and you will get the rest when the patent comes, but I do not know how much that will be."

He testified that Debell then wanted him to touch the pen, but he told him:

"No, I don't want to touch the pen here, and the only place we touch the pen is over to the agent's office; that we had better go over to the office and I will touch the pen there. Capt. Allison spoke up and says that would not make any difference if you touch the pen a hundred times. Then I says: 'You are after this piece of land yourself, and I do not want to do anything on the sly. We had better go over to the office, and I will touch the pen there.' Then I knew he was going to possess the land, so I touched the pen there in the store. * * * They sent an order over there on the other store, and the other storekeeper brought the patent down there, and they gave him about $22 for bringing it down. Then of course it was in his possession, and that is how I touched the pen."

He testified that he never went to school; that no one ever taught him to count money; that he did not know the names of the months; that he did not know how many acres there are in a quarter section,

nor how many cents there are in a dollar; and that all he received for the land was $2,000, and he did not get the rest; that he knew when he touched the pen the land was gone, and he could not get it back. On cross-examination by counsel for Debell he testified that he received the $2,000 in smaller amounts in cash, through orders on Debell to pay to others, in a saddle, in two horses, and in a sheep-lined coat; that he knew when he touched the pen that was the sale of the land to Debell, and he was to get $2,000, but he understood he was to get more; that he knew Debell was going to take it, although he did not give it to him; that Debell was determined to take possession of the land, while he did not really want to let it go; that he did not sell it; that he knew Debell was to take it, and that is the reason he did not say anything; that he received $2,000, but expected more; that Debell told him that when the deed should come he was going to get a pile of money; that Debell said he was going to get a big pile, his arms full. Kelley testified that he never went to Pehinji, never had any such conversation as Pehinji related, never colluded with Debell or Courtis to get the patent in fee simple, or to defraud Pehinji of his land; that Pehinji's ability to look after his own affairs would be rated fair at that time; that he would know he was selling the land and making application for the patent. On cross-examination he testified that he knew nothing about the sale to Pehinji until recently; that he knew Debell from 1905 to 1909, that he once recommended him for Indian trader, and stated he was dealing fairly with the Indians, and that he still thinks so. Debell testified that Pehinji came to him to sell the land; that he never urged or solicited him to do so; that he did not remember very much of the conversation; that he offered him $2,000 for it, and Pehinji took it and was satisfied; that the same day he signed the deed he was paid the money; that he could not remember how much money Pehinji received at the time the deed was made, but Pehinji always knew he could get it; that he bought the land when Pehinji signed the deed; that he might have been in and talked it over with him a few days before.

The date of the deed and the date of its acknowledgment is March 17, 1908. On the account book of Debell Pehinji is credited with land $2,000 under date of January 8, 1908, and under the same date he is charged with cash order to Mrs. Flood $50, and one cowboy saddle $50, and the sum of the items charged against him upon this account, from day to day between January 7, 1908, and March 17, 1908, is $476.50. Debell testified that he made the entries in this account himself; that they are on the book of original entry; that he kept books of account; that sometimes he made entries when the transaction occurred, and sometimes he did not, but that he set it down at the time in Pehinji's case. When his attention was subsequently called to the date January 8, 1908, of the credit of the $2,000 for the land and of the charge of $50 for Mrs. Flood, and to the date March 17, 1908, of the deed and of its acknowledgment, he testified that he was not sure about the books speaking the truth as to the dates; that he knew there wasn't any money paid until he got the deeds; and that he could not give any explanation of the appearance of these items

dated back to January 8, 1908. He testified that he never had any talk with Kelley before he obtained Pehinji's deed about buying the land, or about Pehinji's application for his patent in fee simple, and that Pehinji was competent and capable to manage his affairs. On redirect examination by his counsel he testified that he thought the entry of the credit of $2,000 under date of January 8, 1908, was put in there at the time the deed was executed on March 17, 1908.

Mrs. Flood testified that she received $50 at the store of Debell before the patent was delivered; that she did not get any money before the deed was delivered; that she thought she received the money in January, but that she could not remember in what month the deed or the patent was delivered; that the patent from the government to Pehinji was taken to Debell's office after the deed was made; that she was at Debell's store once with Pehinji; that she signed the deed as a witness; that that was the time that Tod Smith went after the old man to his place and brought him back there and asked her over to Debell's; that Debell wanted to know why he did not take his patent to Debell's. That Pehinji thought he could sell it and do better, because he was not getting enough; that Debell told him he had bought the land already, and he could not take it to any one else.

Courtis, the notary who took the acknowledgment of Pehinji's deed, testified that the date of the deed and that of the acknowledgment were put in on March 17, 1908, when it was executed; that he was employed by Debell; that he sent Tod Smith for Pehinji; that Mrs. Flood and Tod Smith were present; that the deed was executed before the patent was delivered; that Pehinji and Debell had a talk about the sale of the land which he heard prior to March 17, 1908; that he heard Debell offer Pehinji $2,000 for the land at that previous talk; that he was not sure whether or not Mrs. Flood was present at that time; and that he thought Pehinji was capable of managing his affairs.

William F. Schmidt, issue clerk under Kelley, testified that he knew Pehinji, that he was incompetent to attend to his affairs, and that it was part of his duty as issue clerk "to list all the noncompetent Indian lands for sale."

Charles L. Davis, special Indian agent inspecting, testified that he became acquainted with Pehinji in April, 1909, while engaged in investigating sales of Indian lands; that he took two statements from him; saw him in Aberdeen in 1909, and heard him testify in this case; and that he deemed him incompetent. Maj. J. B. Woods is the successor of Kelley as Indian agent. He testified that he first saw Pehinji in 1909; that he had known him about a year at the time he was testifying; that he had talked with him at different times; that his conversations were through an interpreter; that he is one of the old-style Indians, entirely uneducated; that he cannot speak, read, or write, the English language; and that he does not believe he was competent or capable of managing his own affairs in 1908. Many witnesses testified relative to the value of the land in March, 1908, and their estimates varied from $2,000 to $4,000, but the weight of the evidence was that the land was worth about $2,000.

It will be remembered that Kelley's account book shows a credit to Pehinji of $2,000 on account of land on January 8, 1908, and the charge to him of $50 for Mrs. Flood on that day; that she testified she thinks she received this $50 in January, 1908; that Debell testified that he made the entries of the transactions in Pehinji's account at the times they occurred, although he subsequently testified otherwise in an attempt to square his testimony with the theory that Pehinji's deed was executed in March, 1908; and that he paid Pehinji nothing until after the execution of the deed. Now on the next day after the date of the entries of January 8, 1908, on January 9, 1908, Pehinji's application for his patent in fee simple, addressed to the Commissioner of Indian Affairs, is dated at the Rosebud Agency and signed by Pehinji's mark, and under the same date Kelley wrote this letter addressed to the Commissioner:

"Sir: Inclosed herewith is the trust patent to the allotment of Pehinji or Yellow Hair, together with his application for a patent in fee simple in lieu thereof. Yellow Hair is an honest, deserving and good old Indian of full blood. He is and has been for years a faithful friend of the government and I consider him worthy to be intrusted with a patent in fee simple, and I therefore recommend that his request be granted."

On this letter the Secretary of the Interior caused the patent in fee simple, dated February 24, 1908, to be issued to Pehinji and that patent was first delivered to him, as his receipt to Kelley proves, on April 28, 1908, more than a month after his deed is dated. There is other evidence in the record in this case, but it is not of sufficient materiality to modify the result which that which has been recited must induce.

The strong presumption in favor of the finding of the court below has received consideration and due weight in this case. In view of that presumption and finding, the evidence in this record has been read and re-read. It has received deliberation and meditation. The result is that it has led the court to these conclusions: In January, 1908, the United States had decided in February, 1907, that Pehinji was incompetent and incapable to manage his own affairs and especially to manage the sale and the care and disposition of the proceeds of the sale of his land, and that he would be thus incompetent for 25 years from that date, and it had issued its trust patent and agreement dated on that day to hold his land for him and his heirs during that time. The legal presumption was that that decision was just and right and that he was less competent in 1908 than he was in 1907, for he was 76 years of age when his trust patent was issued. An Indian 77 years of age, who has never had any property except that issued to him by the United States, who has been under the charge and care of an Indian agent, who has never had any business or experience in selling land, or caring for or disposing of the proceeds thereof, or in handling any other property except the small amounts issued to him by the government to sustain life, who has no property except 320 acres of land held by the United States in trust for him, without power in him to alienate it, who has drawn his monthly rations from the government for 20 years and is still

doing so, who cannot read, or write, or speak, the English language, cannot count money, and does not know how many cents there are in a dollar, is incompetent and incapable of managing his own affairs within the meaning of the first proviso of the amended section in Act May 8, 1906, chapter 2348, 34 Stat. 182, 183, and especially is he incompetent to sell and convey his land and to care for, manage, and dispose of the proceeds thereof. In the year 1908, Pehinji was such an Indian, and Debell and Kelley knew it, and knew that he held his land without the power of alienation. On January 8, 1908, Debell had conceived the scheme to buy Pehinji's land for $2,000 by inducing him to apply for and induce the Secretary of the Interior to issue to him a patent in fee simple for it on the ground that he was competent, and to induce Pehinji to convey the land to him when he knew that the issue of the patent and the conveyance of the land to him would be a defiance of the settled policy of the United States to preserve the land of such Indians for their benefit, and a wrongful evasion of the restriction on alienation to which Pehinji and the land were subject. He carried this scheme out. On or about January 8, 1908, he induced Pehinji to make a void agreement with or a deed to him to convey the land to him for $2,000. He induced Pehinji to apply for his patent in fee simple on the next day thereafter in order to carry out this scheme. On the same day Kelley, the Indian agent, sent Pehinji's application to the Commissioner of Indian Affairs, with his statement that Pehinji was "worthy to be intrusted with a patent in fee simple, and I therefore recommend that his request be granted," and induced by that statement, and without other evidence of the competency or capacity of Pehinji, the Secretary caused the patent to be issued.

Counsel for Debell argue that Kelley did not represent to the Secretary by his letter that Pehinji was competent or capable to manage his own affairs. He stated that Pehinji "was worthy to be intrusted with a patent in fee simple," and he stated this in order to induce the Secretary to issue one, when the only condition on which he could lawfully issue one was that Pehinji was competent and capable of managing his own affairs, and the Secretary was the quasi judicial tribunal in which the power was vested and upon which the duty was imposed to hear and consider the evidence and adjudge the issue whether or not this condition existed. The Secretary decided on this representation—and that fact raises a perfect cause of action in equity —to set aside the patent as against Debell, who knew the incompetency of Pehinji, whether Kelley's letter was or was not a representation of his competency. If it was the former it was a fraudulent representation, for Kelley could not have failed to know that Pehinji was incompetent, and the United States had the right to the avoidance of the patent by the proper court of equity as against Debell. If it was the latter, then there was no substantial evidence of Pehinji's competency before the Secretary, and his adjudication without substantial evidence to sustain it was an error of law which likewise vested in Pehinji and in the United States a cause of action in equity to avoid the patent in fee simple upon that adjudication. Whether or not there

227 F.—49

is, at the close of a final trial or hearing of a crucial question in reference to the issue of a patent to public lands before the Secretary, any substantial evidence to sustain a claim or a finding of fact in support of such a claim is in his, and in every judicial and quasi judicial, tribunal a question of law, and an injurious error of law of the Secretary when finally deciding such a question presents good ground for relief in equity. Howe v. Parker, 190 Fed. 738, 746, 111 C. C. A. 466, and cases there cited. There can be, however, no real doubt that Kelley meant by his letter that Pehinji was competent and capable to manage his own affairs, and especially to manage the sale of his land and the disposition of its proceeds, and that the Secretary so understood his meaning.

Counsel for Debell contends that the Commissioner of Indian Affairs declared that the test to determine whether or not an Indian was competent and capable to manage his affairs, and especially to sell and convey his land and care for and manage the proceeds thereof under the act of Congress to which reference has been made, was not whether he was competent to manage them with some reasonable degree of prudence and care, but whether or not he would know what he was doing when he should make a deed, and whether or not he would be aware that when he once parted with his property by executing his deed he could not recover it again, and counsel argues that by that test Pehinji was competent. If the Secretary of the Interior determined the competency of this Indian by any such test, he committed another error of law, for a person might know he was making a deed to his property, and that after he made and delivered the deed he could not regain his property, and yet be utterly incapable of managing his affairs, the sale of his property, or the care or disposition of the proceeds. It is indispensable to that competency and capability to manage his affairs which conditions the right of the Secretary to issue a patent in fee simple to an Indian under the first proviso of section 6 in chapter 2348, 34 Stat. 182, 183, that he shall have at least sufficient ability, knowledge, experience, and judgment to enable him to conduct the negotiations for the sale of his land and to care for, manage, invest, and dispose of its proceeds with such a reasonable degree of prudence and wisdom as will be likely to prevent him from losing the benefit of his property or its proceeds.

Either before or after the issue of the patent in fee simple Debell induced Pehinji to convey the land to him, and between January 7, 1908, and July, 1908, paid him, in various amounts of money, goods and moneys paid out on his order, sums which aggregated $2,000. On July 27, 1908, he conveyed this land to Butterfield, and received $3,200 therefor. Knowing, as he could not have failed to know, that Pehinji was incompetent and incapable of managing his own affairs, and especially of selling his land and managing the proceeds thereof with any reasonable degree of wisdom or prudence, and that the patent in fee simple and the deed to him were evasive violations of the settled policy of the nation to preserve and protect incompetent Indians from the conveyance or loss of their property, of the acts of Congress which evidence this policy, and of the express restriction on

the alienation of this land, Debell, by the procurement of this deed, made a wrongful appropriation of Pehinji's land to himself, which constituted him a trustee de son tort of that land for Pehinji, and vested in Pehinji and in the United States a cause of action in equity to avoid the deed as to Debell, or to recover from him the proceeds he received from this trust property. As the avoidance of the deed and the patent would be ineffectual, the United States was entitled to the recovery of the proceeds. Debell received $3,200 on July 27, 1908, for Pehinji's land, but he had paid to the latter, on account of his deed, $2,000, which Pehinji used as he saw fit. He who seeks equity must do equity. The conveyance to Debell was voidable, but it was not void because the United States had issued to Pehinji its patent in fee simple. A just and careful administration of the law with reference to the issue of this patent by the United States and its refusal to issue the patent in fee simple undoubtedly would have prevented the consummation of the scheme of Debell and the making of the deed of Pehinji, and, in view of all the facts and circumstances of this case, the equitable and just measure of the recovery from Debell is deemed to be the amount he realized from the transaction, less the amount he paid to Pehinji, which is $1,200, and interest thereon from July 27, 1908.

The decree of dismissal of this suit must therefore be reversed, and the case must be remanded to the court below, with instructions to render a decree to the effect that, as against Debell, the patent in fee simple and the deed of Pehinji be set aside, and that the defendant Debell pay to the United States, within 60 days after the entry of the decree, $1,200 and interest thereon from July 27, 1908, and the costs and disbursements of the suit, and that if he fail to pay these amounts within that time, the United States have judgment and execution to enforce their collection, but that, as against Butterfield and all parties claiming by, through, or under him, the patent in fee simple and the deed of Pehinji are valid and conclusive, that the notice of lis pendens in this suit be canceled, and that the complainant is entitled to no relief as against Butterfield. The decree may also contain such other provisions not inconsistent with the views expressed in this opinion as the court below may deem fit; and it is so ordered.