UNITED STATES v. FRICK et al.

(District Court, N. D. California, Second Division.   July 30, 1917.)

No. 15388.

1. PUBLIC LANDS ⬡120—AVOIDANCE OF PATENT—FRAUD.
    It being as essential to purchase of public land as timber land that it be
    unoccupied and unclaimed and free from improvements by others as that
    it be more valuable for its timber than for its mineral deposits, all of
    which the statute requires to be stated and shown, fraudulent statements
    as to the former in the application and before the Land Office are ground
    for avoidance of the patent, even though the land be more valuable for
    its timber than its mineral deposits.

2. PUBLIC LANDS ⬡120—AVOIDING PATENT—FRAUD—EVIDENCE.
    Evidence in suit to avoid patent for public land under application to
    purchase as timber land *held* to show fraud in procurement.

3. PUBLIC LANDS ⬡120—AVOIDANCE OF PATENT—GENERAL RELIEF.
    Under the prayer of the bill for general relief in a suit to avoid for
    fraud a patent for public lands, defendant having passed the land to a
    bona fide purchaser, money damages may be decreed.

4. PUBLIC LANDS ⬡120—AVOIDANCE OF PATENT—DAMAGES.
    Defendant in a suit to avoid a patent to public lands obtained by fraud
    having passed title to a bona fide purchaser, recovery may be had of him
    of the amount he sold it for; Act March 2, 1896, c. 39, 29 Stat. 42, 43
    (Comp. St. 1916, §§ 4901–4903), providing for recovery only of the amount
    for which it was sold by the government where title has passed to a bona
    fide purchaser, applying only to case of a patent issuing erroneously, but
    without fraud.

In Equity.   Suit by the United States against W. P. Frick and another.   Decree for complainant.

J. W. Preston, U. S. Atty., and Ed. F. Jared, Asst. U. S. Atty., both of San Francisco, Cal.

Jordan & Brann and Richard M. Lyman, all of San Francisco, Cal., for defendants.

VAN FLEET, District Judge.   This is a bill by the United States seeking equitable relief on the ground of fraud, alleged to have been committed in the procurement of a patent to certain public lands therein described, under an application to purchase them as timber lands, the substance of the material averments being that the application was made by one Robertson, from whom the defendant Frick purchased; that the fraud consisted in false representations and statements made in the sworn application and in testimony given before the Land Office by both Robertson and Frick—the latter appearing as a witness therein, on behalf of the applicant—as to the character and state of the lands, in this, that it was represented both in the application and in a nonmineral affidavit filed therewith and in the testimony given on the hearing that the applicant and witnesses had personally examined the land, that it was unfit for cultivation, but was valuable chiefly for its timber, that it was uninhabited and unoccupied, and that it contained no valuable deposits of gold, silver, cinnabar, copper, or coal,

and that there were no mining or other improvements thereon; that these statements and representations were false, and known to the applicant and said Frick, when made, to be false, and were fraudulently made, solely for the purpose of deceiving the land officers of the United States and inducing the issuance of the patent; that it was the fact, and was known to both Robertson and Frick, that the land had always been more valuable for mineral than for timber, and that for a long time prior to and at the time of the entry of Robertson and the issuance of the patent, and at the time of the purchase of the land from Robertson by Frick, there were located on the land gold quartz and placer mining claims owned by one L. Parker, of Grizzly Flat, the location of which appeared upon the records of the recorder of El Dorado county, wherein the land was situate, and that on a portion of said lands there were several thousand dollars worth of mining improvements owned by said Parker; that these facts were well known to the applicant, Robertson, at the time he made his application and procured his patent, and were fully known to the defendant Frick at the time he gave his testimony and when he made the purchase of the lands. It is alleged that after the transfer of the lands to Frick Robertson died, and that Frick has since held the title to said lands and claims the same and the whole thereof, and that the said claim and the patent constitute a cloud on plaintiff's title.

The primary relief asked is that the patent be held void and set aside, and the land restored to the public domain, but coupled therewith is a general prayer that the complainant have such other or further relief as may accord with the principles of equity.

Frick alone answered (the fictitious defendants having been dropped out), denying the averments of fact counted upon as constituting fraud, and alleging that since prior to the commencement of the action he had ceased to have any interest in the land.

The record disclosed that Robertson's application was filed August 23, 1907; that his final proof was made October 28, 1907; and that on November 7, 1907, he made a conveyance of the land to Frick, the deed not being placed of record, however, until some time after the patent issued, which was on April 6, 1908. It was disclosed at the trial that some time in 1911, the precise date of which does not appear, defendant Frick had deeded the land to the California Door Company, and that this conveyance was placed of record a short time prior to the filing of the bill herein, which was on October 27, 1911; that this fact came to the attention of the government's attorneys for the first time shortly before the trial, but, investigation satisfying them that the door company was a bona fide purchaser for value, they refrained from making it a party, proceeding instead upon the theory that in the event fraud on the part of defendant Frick was shown, vitiating the title as to him, the government would be entitled, under its prayer for general relief, to recover from him the value of the land in lieu of a cancellation of the patent.

The case accordingly proceeded upon this theory, and the main questions presented for consideration are: (1) Does the evidence sustain the charge of fraud as against the defendant Frick? and, if so,

(2) Is the government entitled, in this form of action, to recover the value of the land in money damages as compensation for the fraud through which it has been deprived of its land?

[1] The defendant contends that the only material consideration involved in the question of fraud is whether the land was shown to be more valuable as mineral land than for its timber; that, if shown to be chiefly valuable as timber land, which it is claimed the evidence establishes, then the other facts charged as elements of fraud become immaterial, and the suit must fail. But I cannot accede to the correctness of this contention, either in the premise or the conclusion. In the first place, I am unable to concur in the view that the evidence shows with any certainty that the land is more valuable for its timber than for its mineral deposits; but, if it were otherwise, there are further elements of fraud charged which may no more be ignored than the alleged misrepresentations as to the character of the land. To be open to application and purchase by Robertson, it was quite as essential under the law that the land should be unoccupied and unclaimed and free from improvements by others as that it should be of the character represented in the application; the statute requires these several facts to be stated and shown, and it does not undertake to make any distinction as to their materiality to constitute a valid application for purchase from the government.

In this view, what are the facts as to the alleged fraud? As to the contents of Robertson's application and the nature of the testimony given by him and his witnesses before the Land Office, including the defendant Frick, there is no controversy. Their statements were to the effect that they were intimately acquainted with the land applied for and every part of it, and had been over the property and made a careful examination of it; that the land was not and would not be fit for cultivation; that it was steep, rugged, rocky, and of thin soil; that it was wholly unoccupied and unimproved; that there were no indications whatever of any salines, deposits of gold, silver, cinnabar, copper, or coal thereon, and that the land was chiefly valuable for its timber; that no person had any claim, interest or right in said land or the timber thereon other than the applicant himself.

The evidence for plaintiff tended to show that the land in question is located in a highly mineralized zone where much mining for the precious metals is carried on and has been for many years, and that the land in question has always been well known throughout the community as mineral land; that for several years prior to Robertson's application—some seven or eight—one Parker had both quartz and placer mining claims on a part of the land, which he had purchased from a predecessor and for which he had paid a consideration of some $1,200; his claims were of record in the recorder's office of the county wherein the land is located; he had a substantial dwelling on the land, where he lived with his family; that he prosecuted his mining operations on these claims, from which he had made a living for himself and family from the gold extracted therefrom; that there were at least two well-developed veins or ledges on the property; that his mining operations included several hundred feet of trenches from 10 to 20 feet deep and from 25 to 100 feet or more wide, and that leading

to his claims there was over a mile of ditches used to convey water to them; that these operations and his occupation as a miner were well known, and that they had continued down to a period coincident with, if not later than, the filing of Robertson's application; that, while Parker at about that time was absent by reason of sickness, his son was in possession for him; and that they were negotiating for the sale of their rights in the property, which they held at a value of $10,000.

In this connection Mrs. Parker testified that she handled the gold that was taken out, and that on one occasion in but two days washing they took out over $340; that she thought this was after the earthquake or about that time; that they always made a good living from their mining.

The evidence further tended to show that the occupation of the land by Parker and his mining operations were well known to defendant Frick. One Mauk testified that he and Frick were partners in the mining business during at least a part of this period; that they discussed the amount paid by Parker for his mine or claims on the land in question; and that he and Frick rented a monitor to Parker for use in working the mine, Frick being present when the monitor was loaded to be carried to the mine. Mauk further testified that he had been in the mining business about nine years, and that this vicinity was distinctly a mineral country, and that he had operated three or four mines within it adjacent to this property, and found it profitable.

Mr. Kingsbury, the mineral expert for the government, who made a careful examination of the land on October 3 and 4, 1910, testified that there was evidence of a good deal of work done upon the land; that cabins had been built, excavations 100 feet wide and 250 feet long, a couple of shafts dug, and trenches and ditches; that he made an examination of the ground as to its mineral qualities, and found a number of "colors" of gold, and was of opinion from his explorations that there were sufficient indications for any one to make a mine pay. This was the substance of the evidence in behalf of the government.

As opposed to this, the evidence on behalf of the defendant was chiefly of a negative character. It was to the effect that the witnesses had examined the land or were more or less familiar with it; that they did not discover any improvements thereon of any present value; that while there were evidences that mining had at some previous period been prosecuted to some extent on one part of the land, there was no work of value or any indications of present occupation, and that they thought the place abandoned. Some of them testified that they saw no cabin or dwelling or evidence of habitation. One or two stated that they saw a cabin, but did not investigate as to its being inhabited, as they thought it deserted.

As to the character and nature of the land, the witness Remick testified that he cruised the timber for the defendant and found there were about 5,000,000 feet; he testified at first that he did not know as to its value, but later, on being recalled, stated his judgment that the timber was worth $10 an acre. His evidence as to the mineral character or value of the land was so entirely of a hearsay character that the court was required to strike it out. The defendant Frick, testify-

244 F.—37

ing in his own behalf, stated that he knew positively the land was not mineral land; that he was thoroughly familiar with mining and mining property and had been over this land a number of times; had, in fact, surveyed it; that there were no paying mines in the country; that he considered the land worth about $5 an acre as timber land; that as mineral land, if it ever had any value, it was entirely worked out; that he had mined himself in that vicinity with Mr. Mauk, but that they did not make any money, and that he had satisfied himself that there was no mineral in the district in paying quantities. While he testified that he was familiar with the property, he stated that he did not know that there was a dwelling or house upon it, or that Mr. Parker was living there. He could not recall what he had paid Robertson for the property, but thought that it was about $5 an acre; nor could he recall how long after Robertson procured his certificate that he had made the purchase. He said it was customary for him to buy lands on receivers' receipts, when the man had made his final proof; that he had bought a number of other pieces of timber land in the same vicinity about the same time.

Mr. English, mineral expert called by defendant, testified that he made an examination of the property covering a period of some 12 hours; that he came to the conclusion from his examination that it was of no real value as mineral land, and that in his judgment the Parkers could not have made a living upon it from mining; that he found no evidences of mineral or gold deposits such as to warrant the belief that values were to be found. This is the substance of the defendant's evidence.

There was in addition some evidence and circumstances from which it might be deduced, if necessary, that the application of Robertson was really made in the interest of Frick, and not for his own use and benefit, but for speculative purposes of sale, which the statute forbids, and would render it for that reason void; but, as that aspect is not specially pressed by the government, the question need not be pursued to a conclusion.

[2] It is enough to say that, taking the evidence as a whole, I am fully satisfied that it sufficiently sustains the allegations of fraud counted upon. Very clearly the case is not within the doctrine of the cases relied upon by the defendant from the Land Department holding that the mere existence of evidences of previous mining operations upon the land will not preclude its purchase as timber or agricultural land, where it appears that such mining operations have been abandoned, and that the land is in fact not valuable for the purpose. Here the evidence of any purpose by Parker to abandon the mining rights previously secured and being enjoyed by him is lacking; and the evidence of the mineral character of the land is positive. The land was therefore not open to purchase as timber land; and the procuring of the patent under the circumstances shown was not only a wrong perpetrated upon Parker's possessory rights, but, as well, a fraud upon the government, of which Frick is shown to have been fully aware.

[3] The land having passed to an innocent purchaser, unaffected by the fraud, so that the patent may not be avoided, may the government, in this action, have satisfaction in money damages for its value? De-

fendant contends that it may not; that the suit must fail, and the government, if it desires to pursue its rights further, must resort to an action at law for deceit, wherein defendant will be entitled to a trial of the issues by a jury. Under ordinary circumstances this would be true, but I do not regard the rule as obtaining in an instance of the present character. The case falls, I think, within the well-recognized exception that, where the facts are such as primarily to give equity jurisdiction of the controversy, and that jurisdiction has obtained, if an act of the party charged has made the application of the specific remedy sought impossible or impracticable, the court will retain jurisdiction to award money damages or give such other relief as may be just in the premises.

Such a case was Cooper v. United States, 220 Fed. 867, 136 C. C. A. 497 (decided by the Circuit Court of Appeals of this circuit), which in the circumstances is not to be readily distinguished from the present case. There the transfer of the land was made after suit brought, but before service, and the bill was amended to bring in the grantee as a party. It appearing at the trial, however, that the latter was a bona fide purchaser for value, and the fraud being established, the lower court awarded a decree against the party charged for the value of the land in damages; and the appellate court held that this relief, being within the issues, was properly awarded under the general prayer.

Another similar case is that of Johnson v. Carter, 143 Iowa, 100, 120 N. W. 322, where the court, in response to a similar objection, say:

"It would be a strange perversion of the spirit which pervades all rules of equity if, when a party who has been defrauded of his title to land brings the person who defrauded him into a court of equity, upon a demand for rescission of the conveyance, he can divest the court of jurisdiction by showing that he has conveyed the title to an innocent purchaser, and thus compel the injured party to resort to another forum for the recovery of damages."

So in United States v. Debell et al., 227 Fed. 760, 764, 142 C. C. A. 284, 288, it is said:

"While it is true that a complainant may not, in a suit in equity, join a cause of action in equity and a cause of action at law, and that where his cause of action in equity fails on the proof he cannot recover damages or moneys that he might have recovered at law, it is also true that where the proof sustains the cause of action in equity, but the defendant has by his course of conduct rendered the appropriate relief first sought ineffective, the chancellor may require him to make compensation for his prevention of that relief. Where the primary relief sought is the restoration of property, and the defendant has placed it beyond his and the court's reach, the court may require him to pay the value of the property, or the proceeds he received from it, because the right to this relief inheres in and grows out of the equitable cause of action which the plaintiff has established. * * * If, therefore, the proof established the plaintiff's cause of action in equity against the defendant for the restoration of the land, he cannot escape accounting for the proceeds he obtained for the property, or the value thereof, on the ground that he placed the land itself beyond the reach of the court."

Moreover, in this instance there would be little justice in requiring the plaintiff to bring an action at law. The defendant was made aware early in the trial of the theory upon which the government was pro-

ceeding as to the relief sought, and made no motion to dismiss or any suggestion as to a desire for a jury trial, but proceeded without objection to a submission of his evidence. Under the circumstances I think his present contention comes too late.

Within these principles I think the government entitled to recover under its prayer for general relief, the value of the land of which it has been deprived through defendant's fraud.

[4] The only question remaining is as to the measure of the damages to be awarded in relief. The defendant contends that this may not exceed the price at which the land was sold by the government, $2.50 per acre, and in that regard relies upon the provisions of the act of March 2, 1896 (29 Stat. at L. 42, 43), entitled, "An act to provide for the extension of the time within which suits may be brought to vacate and annul land patents, and for other purposes;" but an examination of the provisions of that act will disclose that it has no application to a case of this character, but deals solely with the rights of bona fide purchasers in instances where the patent has issued erroneously. It does not affect cases proceeding like the present, on the theory of fraud in the procurement of the patent. In cases of the latter character, the principle has always been enforced that one guilty of fraud upon the government is not to be permitted to benefit by his misdoing; that, having deprived the government of property to which it is entitled, the latter may justly claim the return of the entire value of that of which it has been deprived. That was, as will be seen, the measure of damages sustained by the Circuit Court of Appeals in Cooper v. United States, supra, and is implicitly recognized as the proper measure in the other cases cited.

Under this rule, it appearing that the defendant has sold the land in question, which he acquired in wrong of the government's rights, for the price of $32.50 per acre, I am of opinion that that figure should be the measure of the government's recovery. Let a decree be entered accordingly.