MILLER et al. v. UNITED STATES (three cases).

Nos. 102, 103, 365.

Circuit Court of Appeals, Tenth Circuit.

April 12, 1932.

John Embry, of Oklahoma City, Okl. (Charles E. Johnson, V. P. Crowe, and Raymond A. Tolbert, all of Oklahoma City, Okl., and Felix Duvall, of Ponca City, Okl., on the brief), for appellants.

Charles B. Selby, Sp. Asst. to the Atty. Gen. (Seth W. Richardson, Asst. Atty. Gen., and Herbert K. Hyde, U. S. Dist. Atty., of Oklahoma City, Okl., and J. F. Murray, Atty. for the Indians, of Ponca City, Okl., on the brief), for the United States.

Before LEWIS and McDERMOTT, Circuit Judges, and SYMES, District Judge.

LEWIS, Circuit Judge.

The several counts in these three suits sought cancellation of deeds of Ponca Indians by which they conveyed lands in Kay and Noble counties, Oklahoma, to George L. Mil- ler, now deceased. The lands had been allotted theretofore to members of the tribe and were held under trust patents as provided by the Act of February 8, 1887 (24 Stat. 388, 26 Stat. 794, 25 USCA § 331 et seq. and notes), until 1917, 1918, 1919, or 1920, in which years the Indians here involved severally applied to the Secretary of the Interior for and obtained fee patents, and soon thereafter sold and conveyed the respective tracts to Miller. Every count in each of the three bills deals with one tract and its conveyance, and in each count it is alleged that the Indian was an incompetent ward of the United States; that Miller and his two brothers and others acting with them throughout the period of time extending from the first day of January, 1917, to the 30th day of June, 1920, conspired and agreed to impair, obstruct, and defeat the lawful function of the Department of the Interior pertaining to its control and management of the lands belonging to said Ponca Indians, and thus defraud the United States; that Miller pursuant to said conspiracy did on named dates fraudulently and falsely induce, persuade, and entice the several Indians to make applications to the Secretary of the Interior for patents in fee to their allotted lands; that Miller knew that the statements contained in said applications at the time he induced and persuaded the Indians to make them were false; that in each instance and before patents in fee issued he caused each of said Indians to execute a pretended warranty deed purporting to convey the land to Miller; that the deeds were undated and unacknowledged, and that thereafter Miller post-dated them, and caused false acknowledgment certificates to be attached to said deeds, and filed them for record.

It is sufficient to say that the answers denied specifically all of the charges, denied the conspiracy charged, denied that the deeds were executed before patents were issued, denied that the deeds were post-dated, and denied that the Indians were not paid in each instance a fair consideration for their lands.

The court on its own motion appointed a master to take the evidence and report his findings of fact and conclusions of law thereon with recommendations as to the decrees to be rendered, and to return with his report a transcript of the evidence. Each side took exceptions to the master's report. The record brought here including a transcript of the evidence and the master's report covers 1,500 pages. Some of the counts were dismissed. On others findings were in favor of the defendants. These appeals are from decrees

against appellants, defendants below, on twenty counts, but it is conceded as to two of them (the lands of Claude Ironthunder and Irving Stands Black) the decrees should be affirmed, because they executed their deeds prior to issuance of patents; and appellants insist there should be reversals on the remaining eighteen counts.

A general statement of the situation disclosed by the record may be helpful to an understanding of the case. The three Miller brothers and their father before them had conducted for many years a general store and a large ranch a few miles from the Ponca Indian reservation and the Indian Agency. The tribe was a small one and the three brothers had been acquainted with the Ponca Indians since they were boys. George L. Miller spoke their language. All of the Indians here involved, except one woman, had attended school at Chillocco, Oklahoma, and thereafter some of them for several years at Haskell Institute, in Kansas. They were known as educated Indians. Some of them had been in the World War, and returned with officer's commissions. With the exception of the one woman they wrote well, spoke good English, and read the newspapers. They lived on their allotments, did some farming, and leased their lands without government supervision. Credit was given them at Miller brothers' store for their needs, for groceries, dry goods, clothing, and sometimes on the purchase of horses, harness, and farm implements. Their accounts both before and after these transactions would at times amount to several hundred dollars, and extend over more than one year before they were settled and paid. Their income was from farming and rentals. There is no proof or claim that they were ever charged different or higher prices for what they purchased from Miller brothers than were the whites. At the time of the trial one of them was indebted there more than eight hundred dollars. On many occasions Miller brothers would advance them money when they had to buy elsewhere. There were instances where the Indian had received substantially all he got for his land in Miller's bank checks given from time to time over several months, a comparatively small amount being paid when Miller got the deed. The Indians were indebted to Miller brothers in the manner stated at the times they applied for patents and made conveyances; and their unpaid accounts at the store and cash advanced were deducted from the purchase price of their lands.

Applications to the Secretary by the Indians for the fee patents to the lands which they wished to sell were a list of questions on printed forms containing blanks for answers. These answers were usually written in by the applicant. They were then sworn to at the agency and forwarded to the Secretary at Washington by the Indian Agent with his recommendations. Many of them answered that they were not in debt whereas they were at the time in debt to Miller brothers for cash advanced and at the store, frequently in large amounts. Some of them answered that they were in debt to Miller brothers. The truthfulness of their answers is not challenged in other respects. The questions were numerous and were intended to disclose fully the condition of the Indian, that of his family, and his needs, and the number of acres then held in trust for him, for his wife, and children, if any, and his business experience. In some instances applications were made on a form that did not contain questions. They contained only a description of the land to which he desired patent, its value, his age, degree of blood, and whether married or single; and it was signed by him. Applications in that form were referred to a competency commission of three members who investigated the condition of the Indian, his lands, improvements thereon, if any, his schooling, and general intelligence, and it made its recommendations to the Secretary in a report containing the result of the investigation. In all of these counts, whether the application was in form of answers to questions by the Indian alone or on the competency commission's reports, the applications were granted and fee patents issued to the particular land applied for, thus authorizing the Indian to sell the land.

Although the master made a separate report on each count, he made findings of fact and stated conclusions in most of them which he intended by reference to apply to other counts.

In all counts in which title to the land involved still remained in George L. Miller or Miller brothers the master recommended that the deeds of the Indians be cancelled, and that was decreed. In counts in which innocent purchasers had acquired title judgments were rendered against Miller brothers for the value of the land and the purchaser's title quieted. The master found, and the district judge sustained him, that none of the deeds to Miller was post-dated, and that all of them, except the two mentioned above, were executed after fee patents had issued. Several Indians testified that they signed a contract before patent to sell the land to Miller, but the master on the whole evidence on that

point expressly held to the contrary, and the district judge approved.

A careful consideration of the master's report convinces that his recommendations of decrees against Miller brothers rested on two findings of fact made by him and have no other support: 1. That Miller brothers formed a "plan and purpose" prior to the issuance of fee patents to buy of many Ponca Indians their lands as they became for sale, advanced to them sums of money and gave credits approaching in many instances the purchase price and value of their lands without a contract to buy the Indian's land until after the fee patent should issue; 2. that all of these Indians were incompetent to transact their own business when they applied for fee patents and made conveyances. As to the first finding the master said:

"While the evidence is not sufficient in most, if any instances, to show that George L. Miller, the member of Miller Brothers who dealt with the Indians in trade and sale of merchandise, and leases and purchase of their lands, actually enticed or advised, or assisted the Indian allottee to apply for fee patents for their lands, yet the large and extravagant credits he extended the Indians were in most instances on and after the Indian made application for the patent, and George L. Miller watched these cases closely, at one or more times advised or secured loans of money so that individuals and delegations of prominent Indians could and did make trips to Washington, to and did interview the authorities in the interest of getting these and other Indians fee patents; he did pay or see to the paying of counsel for the Indians, money or credit, one Mr. Kapler, at Washington, who in instances notified him when the patents were issued, and by, or soon after the time the patents reached the Indian Agent, negotiated and secured deeds from the Indians for their lands, and in most, or nearly every instance, the Indian's account for advances for money, groceries, clothing, implements, horses, harness, and other articles, and many times automobiles, constituted an important and in many instances nearly the whole consideration for the Indian's land. There were exceptions, but this was the custom practiced, as shown not only by the evidence of the Indians, who in many instances were then, and are now satisfied, but more especially by the evidence of George L. Miller himself, and his own brothers, and this scheme of extravagant credit was carried on for years, and while these clever, but improvident Indians were apparently fully advised, this practice materially, greatly and probably principally induced the Indians to apply for their fee patents."

The District Judge in his opinion said this on that subject after final hearing:

"The findings show Miller Brothers were familiar with the Indians and their deficiencies and had a motive to acquire these lands advantageously while they were incapable of safeguarding their interests. And the testimony, facts and circumstances there set forth (in the master's report) convincingly and sufficiently prove to the impartial mind that they formed a scheme in advance to and they did incite and cause the Indians to apply for the patents, and as Miller Brothers knew on misrepresentations of their competency, and that the purchases of the land were a consummation of that scheme, thus substantially establishing the charge laid in the bills of conspiracy and acts to effectuate it."

■ The master's report should not be rejected or disregarded without clear and convincing reasons, and when approved by the District Judge, as here, the presumptions in its favor are given additional weight. Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; Girard Life Ins. Co. v. Cooper, 162 U. S. 529, 16 S. Ct. 879, 40 L. Ed. 1062; Furrer v. Ferris, 145 U. S. 132, 134, 12 S. Ct. 821, 36 L. Ed. 649. We accept those findings, but their application is another matter.

■ The second finding of the master on which the decrees rest, approved by the trial judge, presents a more serious aspect. Section 6 of the Act of February 8, 1887, and the Act of May 8, 1906 (34 Stat. 182 [25 USCA § 349]), amending that section (34 Stat. 182) vests in the Secretary of the Interior the discretion and power to determine when an Indian allottee is capable of managing his affairs, and if he so determines he has authority to issue to such Indian a patent in fee simple to his land, and the latter is then free to sell it. The Secretary so determined as to the Indians in all of these counts, and they soon thereafter made the sales and conveyances to Miller. Evidence was introduced pro and con on the competency of these Indians at the times they executed deeds, and at the close of the evidence counsel for the United States asked the master to find that all of these Indians were in fact competent, but he declined to do so. He said the great weight of the evidence sustained that conclusion, and we agree that the record so shows. He took the opposite view based so far as we can ascertain solely upon his observation of the Indians as they testified, and ruled they were incompetent. Miller brothers testified they be-

lieved them competent. The master was confronted with the rulings of the Secretary, and we think the Secretary's findings that the Indians were competent cannot be ignored, but must be accepted for all purposes of these appeals; unless his rulings can be avoided on some settled principle of equity. United States v. Budd, 144 U. S. 154, 12 S. Ct. 575, 36 L. Ed. 384; Quinby v. Conlan, 104 U. S. 420, 26 L. Ed. 800; United States v. Stinson, 197 U. S. 200, 25 S. Ct. 426, 49 L. Ed. 724; Lykins v. McGrath, 184 U. S. 169, 22 S. Ct. 450, 46 L. Ed. 485; Durango Land & Coal Co. v. Evans (C. C. A.) 80 F. 425; United States v. Northern Pac. R. R. Co. (C. C. A.) 95 F. 864. It should be said that the master thought the Secretary, in his rulings, had applied a wrong standard of competency and therefore erred as matter of law, that the correct standard was not the one stated in the statute—"competent and capable of managing his affairs"—or in the instructions of the Department of the Interior on Indian affairs—"as competent to transact his own business as the average white man." The correct standard as conceived by the master was found in an excerpt from United States v. Debell (C. C. A.) 227 F. 760, 770, wherein it was said that an Indian to be competent must "have at least sufficient ability, knowledge, experience, and judgment to enable him to conduct the negotiations for the sale of his land and to care for, manage, invest, and dispose of its proceeds with such a reasonable degree of prudence and wisdom as will be likely to prevent him from losing the benefit of his property or its proceeds."

And so the master concluded from testimony before him that inasmuch as these Indians had expended all of the moneys received for their lands and had none of it left at the time of the trial, eight years after the Indians had sold their lands, they were all incompetent. Few white men would measure up to this rule. There was no proof as to what standard the Secretary of the Interior applied, further than the presumption that he applied the law; nor was there proof of the evidence that was before him, if any, when he passed on the applications, aside from the applications and recommendations of the Indian Agent and competency commission. Their good faith is not impeached. We find no support of the master's conclusion that the Secretary erred in law. The action of the Secretary was not void, but voidable; and, of course, it could be impeached for fraud. See cases last cited supra. Accepting the Secretary's findings, the question is whether Miller's conduct was such as to mislead him when he made his rulings that the Indians were competent to manage their own affairs and to take fee title to and dispose of their lands as the statute provides, when otherwise he would have held them incompetent by refusing their applications. We are unable to see how the facts found by the master, shown in the excerpt from his report, supra, could have misled the Secretary in his rulings. The Secretary could act only on the proof presented him. All of the applications for patents relative to the counts here under consideration are not in the record. In three instances a competency commission recommended in its report that the fee patents be issued. Those reports contained no statements as to whether the Indian was or was not then in debt. In two of the applications by questions and answers the Indians stated they were in debt, one of them to Miller brothers, and each stated he wished to pay his debts. In several others in the record the Indian stated he was not in debt, which statement was false. But the proof does not show that Miller brothers knew that the Indians had made these false statements. Haydee Blue Black testified that Miller told her to ask for a blank application at the agency which she did and she procured two of them. She took them to George L. Miller and told him she could not fill it out. He then wrote the answers in lead pencil, and she copied it in her own handwriting. But that application is not in the record, and we are unable to find from the record that it contained false answers on any subject. Miller brothers denied knowledge of false statements in any of the applications.

The master found that Miller brothers formed a "plan and purpose" prior to the issuance of fee patents to buy the lands as they became for sale. A plan and purpose to acquire their lands when they became for sale at a fair price was not an unlawful plan and purpose. Everyone had that privilege on the issuance of fee patents. The patents were issued for the purpose of enabling the Indian to sell the land described in his application. The applicants stated they needed farm implements, different kinds of live stock, clothing for family, groceries, etc. Miller advanced the money to three Indians to go to Washington after their applications had been sent in to see those in charge of issuing fee patents. They saw and talked with Mr. Hawks, an assistant in the Secretary's office, and patents were issued to them. The master found that Miller paid a fair price for each tract except two, and that those two tracts were worth more because Miller later

sold them for considerably more than he paid. The master expressly found that George L. Miller, who it appears conducted all of these transactions, did not actually entice, advise, or assist the Indians to apply for their fee patents, but it was the large and extravagant credits that Miller extended to the Indians, which the master says were in most instances after the Indians made their applications, and that these extensions of credit probably principally induced the Indians to apply for their patents; but the Indians owed large accounts at Miller brothers' store, many of them prior to their applications. Miller sold several tracts for the identical amounts that he paid for them. We are unable to see how or in what way the plan and purpose attributed to Miller brothers by the master could have influenced the decisions of the Secretary on the applications; and obviously it could not and did not mislead him. So the Secretary's finding of competency must stand, and those of the master are rejected. There remains the master's finding that Miller brothers formed a "plan and purpose" to buy these lands when salable—otherwise spoken of by the district judge as a motive, scheme, and conspiracy; but which was, we think, no more than a lawful intention to do a lawful act, and for which neither law nor equity imposes liability.

Affirmed as to the Ironthunder and Stands Black counts. Reversed as to the other eighteen counts with directions to vacate the decrees entered on them and to dismiss the bills as to those counts. Appellants may have their costs on these appeals.