UNITED STATES v. BOYLAN et al.

(District Court, N. D. New York. March 3, 1919.)

1. INDIANS ⬉⟳15(1)—ONEIDA LANDS IN NEW YORK—CONVEYANCES.

A conveyance of lands in the remaining Oneida reservation in New York by a member of the tribe residing thereon, made between 1843 and 1892, while Act N. Y. April 18, 1843 (Laws 1843, c. 185), was in force, is invalid to convey any interest, unless executed in conformity to that act, which provided for the appointment of a superintendent of the Oneida Indians and that all conveyances of their lands should be executed before the first judge of Madison county, and should have indorsed thereon the consent of such superintendent.

2. INDIANS ⬉⟳5—STATUS OF INDIANS IN ORIGINAL STATES—AUTHORITY OF · UNITED STATES.

While the United States has no ownership in Indian lands in any of the 13 original states, the native Indians who hold and occupy such lands, whether in common or in severalty, by agreement between themselves, are its wards, and it may maintain suits for the protection of their property and rights.

3. INDIANS ⬉⟳15(1)—LANDS—RIGHT OF ALIENATION.

If the state of New York had jurisdiction to authorize the Oneida Indians to hold their lands in that state in severalty, as it did by Act April 18, 1843 (Laws 1843, c. 185), it also had power by that act to impose restrictions upon their alienation, and if such power is solely in the general government, in the absence of legislation by Congress on the subject, there is no right to hold in severalty, and no right of alienation to private individuals whatever.

4. INDIANS ⬉⟳13—LANDS—JURISDICTION OF COURT TO ORDER SALE.

A decree of a court of New York for the sale of lands on the Oneida Indian reservation, and sale thereunder, in a partition suit between a white grantee, who was without valid title, and Indian occupants, to which suit neither the United States nor the state was a party, held void.

5. INDIANS ⬉⟳15(1)—LANDS IN NEW YORK—ALIENATION.

The law of New York, constitutional and statutory, has always prohibited the acquisition by white persons of any Indian lands in the state, except in the manner prescribed by the Legislature; and Pen. Code, § 384a, as added by Laws 1893, c. 692, makes it a misdemeanor for any person to purchase, contract for, or enter into possession of any such lands.

6. INDIANS ⬉⟳15(1)—ONEIDA LANDS IN NEW YORK—ALIENATION—SUIT TO SET ASIDE.

There is no law of the United States which confers on individuals of the Oneida Tribe of Indians in New York power to sell or incumber any of the lands on their reservation, and the United States may maintain a suit to enforce the restoration of any of such lands conveyed or incumbered in violation of the settled policy of both the national and state governments.

At Law. Action by the United States against Julia Boylan and Anna Siver Moyer. Judgment for the United States.

This is an action by the United States against Julia Boylan and Anna Siver Moyer, in the nature of an action of ejectment, to recover from said defendants, for the benefit and protection of a remnant of the Oneida Tribe of Indians, a tract of land situated in the town of Lenox and in the outskirts of the city of Oneida, Madison county, N. Y., containing about 32 acres of land, and which land, it is con- . ceded, formed a part of the original Indian reservation for said tribe

⬉⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of New York Indians. To avoid repetition, the facts will be stated in the opinion.

Frank J. Cregg, Asst. U. S. Atty., of Syracuse, N. Y., for the United States.

Joseph Beal, of Oneida, N. Y., for defendants.

RAY, District Judge. The lands in question are part of lot 17 on map of Nathan Burchard, hereafter mentioned, and are bounded and described as follows:

"Beginning in the center of the highway leading from Oneida to Munnsville, known as the 'west road,' bounded on the south by lands owned by Phœbe Lyon and on the east by lands owned by S. H. Farnham, of Oneida, on the north by lands owned and occupied by Daniel Scanandoah, and on the west by said highway to the place of beginning, containing 32 acres of land, be the same more or less."

It is conceded that the Oneida Tribe of Indians, one of the Indian tribes in the United States at the time of the discovery of America, was in the actual possession and occupation of the lands in question, and also of the other lands adjacent to and surrounding them, and continued in possession down to May 23, 1842, when a treaty was made "between the First and Second Christian parties of the Oneida Indians residing in the town of Lenox, county of Madison, and state of New York, constituting the party of the first part, and the people of the state of New York, acting by their agents, the commissioners of the land office, constituting party of the second part." See Book No. 1 of Original Treaties and Other Indian Papers, at page 209. This treaty was duly signed and executed, and contained as a part thereof two schedules, A and B, hereafter referred to.

Article 1, for considerations therein recited, provided and stated that the said party of the first part "do hereby grant, bargain, sell, cede and surrender to the people of the state of New York all the right, title, estate and interest of the said party of the first part in and to all *that part* of their reservation not heretofore released by the said party of the first part to the party of the second part known, and distinguished as lots numbered 1, 3, 4, 5, 7, 10, and 15 by Nathan Burchard's map and certificates of survey, containing 371.34 acres." Articles 2 to 5, inclusive, provide for sales of such lands so ceded, and for payments to the Indians named in Schedule A, known as "Emigrating party." Article 6 provided:

"It is hereby stipulated and agreed that those members of the First and Second Christian parties of the Oneida Indians as are included in Schedule A hereby release, quitclaim and forever renounce to the said Indians named in Schedule B and to those who may succeed them in their right, title and interest, claim and demand whatsoever in and to the said portion of land so set apart, described, reserved and allotted for those of the First and Second Christian parties of said Indians who do not at present intend to migrate, enrolled in Schedule B as aforesaid, all and the residue of the said reservation not now nor heretofore ceded to the people of the said state, known and distinguished as lots numbered two, six, eight, nine, eleven, twelve, thirteen, fourteen, sixteen, seventeen, eighteen, and nineteen as surveyed and allotted by Nathan Burchard; reference is here had to the said map and field book of the said Nathan Burchard and to be filed in the offices of the Secretary of state and surveyor general; when copies thereof are endorsed thereon and

duly authenticated by him they shall forever be deemed the metes and bounds of the lands ceded and those reserved. And those reserved shall be deemed the common property of all the individuals included in Schedule B."

Article 7 provided that the Indians should surrender the lands, and if they belonged to those named in Schedule A such Indians should on payment immediately emigrate and go beyond the jurisdiction of the state of New York; but if they belonged to individuals named in Schedule B, then such persons should give up possession of the lands so ceded.

It is seen that the Indians in the reservation were divided into two classes, those named in Schedule A, and who were to emigrate, and those named in Schedule B, who were to remain and not emigrate, and who were to have and hold and own the remaining lands, which included lot 17, and also lot 19, and which lot 17 included the lands in question, the same as before.

Schedule B gave the names of the "tenants in common and owners of lots No. 17 and 19" (who were not to emigrate) as follows:

"Aaron Cooper, Hannah Cooper, Dolly Cooper, Margaret Cooper, Susan Cooper, Betsey Cooper, Jenney Cooper, Moses Cooper, Moses Charles, Caty Charles, Margaret Charles, Susan Charles, Mary Charles, Elizabeth Cornelius, Daniel Cornelius, Roderic Cornelius, Jenney Cornelius, Job alias Anthony Antone, Cornelius Antone, Thomas Antone, Mary Antone, Mary Antone and Susan Antone."

It is seen that under this treaty the said named persons were designated as the owners as tenants in common of lot 17, which included the lands in question.

These people comprised the Cooper, the Charles, the Cornelius, and the Antone families, and were 23 in number. Mary Charles, one of such Indians (now Schenandoah), was a witness on the trial. Moses and Caty Charles were the father and mother of Margaret who was the mother of Susie and Mary Schenandoah. William Honyost is a brother of Mary, above named. Mary Schenandoah lived on the reservation on the premises in question until some six years ago, when she, with others, was put off by the sheriff of Madison county under the authority of the writ of assistance hereafter mentioned. This was November 30, 1909. She had always lived there with other Indians on that place. Mary Schenandoah was known as Mary Honyost before her marriage. She took that name when her mother, Margaret, married Peter Honyost. Isaac Honyost was her brother, who was born after the treaty of 1842. Lucy Charles married, and took the name George, and became Lucy George, and died in 1870, leaving seven children, Elizabeth, Henry, John, Jenney, Eli, Mary, and Jeanie. Jeanie, John, and Eli died when very young. The husband died recently on the reservation. Mary George had three children, who died in infancy. In April, 1884, Mary Schenandoah, Margaret Honyost, and Isaac Honyost were all living on the reservation and on the 32 acres of land in question.

William Rockwell, an Oneida Indian, son of Margaret Honyost, daughter of Maggie Charles, one of the 23 persons named in Schedule B, gave testimony to the effect that he was born in a house on lot

17 of this reservation, that these premises were occupied by these Indians and their descendants down to the time of the eviction by the sheriff, and occupied by them in common, and that tribal relations, etc., were maintained, and that they had chiefs and held and attended councils. He says there were some 22 or 23 members of the Honyost family, meaning descendants of Margaret Charles, who occupied these premises in the manner mentioned. He testified the members of the Cooper, Cornelius, and Antoine families are all dead, unless it be some of the Coopers. Isaac Honyost once occupied and cultivated the land until the eviction, but died about two years before the trial.

1844, November 12, Moses Charles deeded to Daniel Schenandoah 7.44 acres of land in lot No. 17.

1845, October 4, Aaron Cooper and Elizabeth Skenandoa deeded to Absolom Gregg a part of lot No. 17, which lot is described as containing 62.52 acres, and the deed says, following the description:

"And being the shares and interest of the said Aaron Cooper and of his wife and of his six minor children and also of the said Elizabeth Skenandoa to three acres in and to said lot No. 17."

The recited consideration was $1,600.

1847, April 15, Thomas Antonia and Betsey Scandandoa deeded to William Miller, in consideration of $435.78, certain described parts of lot No. 19, but no part of lot No. 17.

1849, September 18, Jobe Antoine conveyed to Absolom Gregg, for $225, a part of lot No. 19, which is across the road and west of lot 17.

1851, November 24, Polly Antonio, Susan Antonio, and Polly Antoine, 2d, conveyed to William Miller, for $897.60, 22.44 acres of land in lot No. 19, and there is added to the description this:

"Embracing the three shares of said lot belonging to the three said Indian women, viz. Polly Antone, Susan Antone, and Polly Antone (2d)."

The above deeds were acknowledged before the first judge of the county and were consented to by the commissioner of Indian affairs of the state of New York.

1865, May 13, Katy Charles, Betsey Canada, Susan Antone, and Jacob Antone, "children and heirs at law of Polly Cooper," deeded to John Gregg, for $120, three acres of land (lot not given), and this deed says:

"The right of way and premises hereby intended to be conveyed being the same conveyed by the said Peter Honyost and Peggy, his wife, to the said Warren J. Gilbert on the 22d day of December, 1859, by warranty deed. The foregoing description is taken from a warranty deed given by Warren J. Gilbert and wife to Polly Cooper, bearing date April 29, 1862."

1868, November 21, a quitclaim deed, not recorded or executed, conveying to Margaret Honyost, for $100 and love and affection, "all of the real estate which she the said Caty Charles owns or is possessed of, also all of that certain house and lot 7⁰⁴/₁₀₀ acres where she now resides in Lenox on the road to Stockbridge from Oneida, bounded on the north by lands of Daniel Scande," was drawn.

1875, January 16, Betsey Cornelius, for $332, conveyed to Barney Ratnour the following:

"All that tract or parcel of land situate in the town of Lenox, Madison Co., N. Y., and bounded and described as follows, viz.: On the north by lands belonging to the estate of Jabez Lyon, deceased; on the east by lands belonging to John Green; on the south by lands belonging to John Gregg; on the west by the highway leading from the old Seneca turnpike to the village of Knoxville—containing seven and $56/100$ acres of land, more or less."

1882, May 10, James George, by quitclaim deed, conveyed to Philander Spaulding for $10:

"All that tract or parcel of land situate in Lenox aforesaid, lying on the east side of the highway called the 'west road' leading from Oneida to Stockbridge, bounded as follows, viz.: Westerly by said highway, southerly by land of Margaret Honyost and others, easterly by land of S. H. Farnum, and northerly by land of Mary Honyost and others, containing seven acres, more or less."

1882, May 19, Henry George, "heir at law of Lucy George," for $10, conveyed to Philander Spaulding the following:

"All that tract or parcel of land situated in said town of Lenox and being eight acres or thereabouts, set off to said Lucy George, deceased, an Oneida Indian, on the said side of the highway called the 'west road' leading from Oneida to Knoxville, and bounded south by lands of Margaret Honyost, east by lands of Stephen H. Farnam, north by lands of Mary Honyost and others, and west by said highway."

1884, April 11, Margaret Honyost and Mary Honyost, for recited consideration of $3,000, conveyed to Isaac Honyost the following:

"All that tract or parcel of land situate in the town of Lenox, county and state aforesaid, all that tract or parcel of land described as follows, to wit: Bounded on the west by the highway leading from Oneida to Munnsville, known as the 'west road,' and on the south by lands now owned and occupied by Mrs. Phebe Lyon, and on the east by lands owned by G. H. Farnam, of Oneida, formerly owned by John Green, and on the north by lands now owned and occupied by Daniel Scanadoa, containing thirty-two acres of land more or less."

These clearly are the same lands in question in the instant case.

1884, April 22, Margarette Honyost and Mary Honyost conveyed to Isaac Honyost and William Honyost, for $3,000, by deed containing certain recitals and statements, as follows:

"All that tract or parcel of land situate in the town of Lenox, county of Madison, and state of New York, and bounded and described as follows, to wit: Bounded on the north by the lands now owned and occupied by Daniel Sconadoa; on the east by lands owned by S. H. Farnam, formerly owned by John Green; on the south by lands now owned and occupied by Phœbe Lyon; on the west by the highway leading from Oneida to Munnsville known as the 'west road'—containing twenty-two $32/100$ acres of land, being three shares of seven $44/100$ acres of land each, two of which belong to Margarette Honyost in her own right, and one of which belongs to Mary Honyost in her own right, under an allotment in severalty to the Oneida Indians heretofore made, to the deed of which reference is made for greater certainty, excepting and reserving thereout one acre of land upon which a house now stands, to be taken out of the northwest corner of the piece of land hereby deeded by Mary Honyost; said land lying next to Daniel Sconadoa's land and bounded west by the highway aforesaid and the lines extending equal distances east and south far enough to make one acre of land. This deed is intended to take the place of an undelivered deed executed April 11, 1884, to Isaac Honyost, for the same consideration, and by mistake was made to said Isaac Honyost only, and was therefore undelivered, and this deed is executed by the grantors and accepted by the grantees in the place of said other deed."

This deed was not recorded.

1885, April 10, Philander Spaulding conveyed to Isaac Honyost, for $50, the following:

"All that piece or parcel of land situate in the town of Lenox aforesaid, laying on the east side of the highway leading from Oneida to Stockbridge, known as the 'west road,' bounded on the westerly by said highway, southerly by lands of Margaret Honyost and others, easterly by lands of S. H. Farnam, and northerly by lands of Mary Honyost and others, containing seven acres of land, more or less. Being the same piece of land quitclaimed to said party of the first part by James George on the 10th day of May, 1882, and the same piece of land quitclaimed to said party of the first part by Henry George on the 19th day of May, 1882."

1898, September 13, Isaac Honyost, for $1, conveyed to Chapman Schanandoah (machinist on United States gunboat Marietta), subject to a mortgage of $1,250 given by Isaac Honyost to Patrick Boylan, "and now held by said Boylan's executor, and which mortgage and the interest thereon second party hereby assumes and agrees to pay as a part of the consideration of this conveyance," the following:

"All that tract or parcel of land, situate in the town of Lenox, county of Madison, and state of New York, all that tract or parcel of land described as follows, to wit: Bounded on the west by the highway leading from Oneida to Munnsville, known as the 'west road,' and on the south by lands now owned and occupied by Mrs. Phœbe Lyon, and on the east by lands owned by S. H. Farnam, of Oneida, formerly owned by John Green, and on the north by lands formerly owned and occupied by Daniel Sconandoa, containing thirty-two acres of land, more or less."

1885, April 1, Isaac Honyost gave to Philander Spaulding a mortgage to secure the payment of the sum of $1,250 on the following premises:

"All that tract or parcel of land situate in the town of Lenox, county and state aforesaid, bounded and described as follows, to wit: Beginning in the center of the highway leading from Oneida to Munnsville, known as the 'west road,' bounded on the south by lands owned and occupied by Phebe Lyon, and on the east by lands owned by S. H. Farnam, of Oneida, on the north by lands owned and occupied by Daniel Sconandoa, and on the west by said highway, to the place of beginning, containing thirty-two acres of land, be the same more or less."

This mortgage was recorded April 2, 1888, in Liber 97 of Mortgages, at page 488, and April 4, 1888, was assigned by Philander Spaulding to Patrick Boylan and duly recorded in Liber 97 of Mortgages, page 488.

Shortly prior to July 3, 1897, Patrick Boylan died, leaving a last will and testament, which was duly proved and probated and recorded July 8, 1897, and July 3, 1897, letters testamentary were duly issued by the Surrogate's Court of Madison county, N. Y., to Joseph Beal, the sole executor in said will named, who duly qualified as such. By said will he gave the said mortgage to his wife.

1905, March 6, said Joseph Beal, as executor of the will of Patrick Boylan, deceased, commenced a statutory foreclosure of said mortgage by advertisement, and in addition to publishing and posting a copy of the notice of sale which, according to the notice of sale, was to take place June 3, 1905, at 10 o'clock a. m., at the office of the

hotel known as the Brunswick, in Oneida, N. Y., was personally served on Isaac Honyost, Nicholas Honyost, Mary Schonandoah, Mary George, and Chapman Schonandoah, and no other person or persons. The affidavits do not show who were in possession or occupation of the premises at the time, or that these persons, or any of them, were. The sale did not take place at the time mentioned, but was postponed four times by a notice, "The above sale is postponed," etc., and finally:

"The above sale is further postponed till the 15th day of July, 1905, at 10 a. m., at the same place.                    Joseph Beal, Executor."

The affidavit of Joseph Beal states he acted as auctioneer on the 15th day of July, 1905, and sold the premises for $1,250, the highest sum bid therefor, to Michael Burke, of Oneida, N. Y. The affidavits relating to such statutory foreclosure by advertisement were recorded August 20, 1905, in Book 216 of Deeds, page 76.

1905, August 29, in consideration of $1, said Michael Burke and Katheryn, his wife, conveyed the same premises by a quitclaim deed to Julia Boylan, and July 10, 1906, Philander Spaulding and wife conveyed the same premises by quitclaim deed to Julia Boylan for $1. These quitclaim deeds are recorded.

1906, July 26, said Julia Boylan commenced an action in the Supreme Court of the state of New York for the partition of said lands and premises in question here by filing a summons and complaint and notice of the pendency of the action, or for a sale if partition could not be had without prejudice, in which action Mary George, Noah George, Henry George, Maggie George, wife of Henry George, William Honyost, Mrs. William Honyost, wife of William Honyost, and Isaac Honyost were made defendants. Chapman Schenandoah and his wife were subsequently made parties. The defendants appeared in the action by their attorneys and answered. The issues framed were by consent referred to a referee, Charles R. Coville, to hear, try, and determine, and to take proof of the plaintiff's title, and to ascertain the rights of the respective parties in such real estate, and report whether same was so circumstantial that a partition could be had without great prejudice to the owners, or whether a sale should be had.

The referee reported that partition could not be made without great prejudice, and that a sale should be made, and that the rights, title, and interest of the parties were as follows:

(1) That Julia Boylan was seized and entitled in fee simple to an undivided thirty-one fortieths of same. Her title, if any, came through such statutory foreclosure and quitclaim deeds mentioned.

(2) Mary George was seized and entitled in fee simple to an undivided three fortieths of same.

(3) Henry George was seized and entitled in fee simple to an undivided one fortieth of same, subject to the inchoate dower right of his wife, Maggie George.

(4) That William Honyost was seized and entitled in fee simple to an undivided one fortieth of same, subject to the inchoate dower right of his wife.

(5) That Chapman Schenandoah was entitled to an undivided four fortieths of same, subject to the inchoate dower interest of his wife.

(6) That Isaac Honyost had no interest therein.

A sale was decreed by interlocutory judgment on the report that partition could not be made without great prejudice, etc., and said Charles R. Coville was made referee to sell, and it was decreed that the sale should be for cash.

Neither the United States, nor the state of New York, nor the commissioner of Indian affairs or of the Oneida Indians, was made a party to the suit or proceedings.

The referee to sell sold the premises for $725, and made and filed his report; but Mr. Justice Lyon, at Special Term, refused to confirm the sale and direct final judgment, on the ground "that no title to or estate or interest whatever in the lands sought to be partitioned in the action is or at any time has been vested in the plaintiff, and that the plaintiff has not and never had the right to maintain an action for partition of said lands," and an appeal was taken to the Appellate Division, which reversed his order and remitted the matter to the Special Term, which directed a confirmation and the giving of a deed to the purchaser. This reversal was on the ground solely that Judge Lyon's order was a reversal of the referee, who was appointed to hear and determine, and that defendant's remedy was by appeal. The merits were not passed upon. See Boylan v. George, 133 App. Div. 514, 117 N. Y. Supp. 573.

The findings of the referee are contrary to the evidence in this case. Thereupon a final judgment was entered August 3, 1909, confirming the sale and directing "that said referee execute to the purchaser upon such sale a conveyance of the property sold." The name of the purchaser is not disclosed or stated in such judgment. This judgment also directed the disposition of the proceeds of sale as follows: To the referee, $25; to the plaintiff's attorney, including an extra allowance of $36.25, the sum of $303.78; to the plaintiff, on her costs on appeal, $89.15; the whole sum to which defendants were entitled, and the balance to the plaintiff, $307.07. The plaintiff was also awarded a judgment for deficiency on costs awarded of $6.05. Then, it is claimed, all interest of these Oneida Indians in these lands was extinguished. The referee's deed, executed September 22, 1907, recites that the sale was made to the plaintiff, Julia Boylan, and the deed was executed and delivered to her.

This final judgment, describing the real estate, also directed as follows:

"It is further ordered, adjudged and decreed that the said purchaser be let into possession of said property, and that any of the parties to this action who may be in possession of said premises or any part thereof, and any person who since the commencement of this action has come into the possession of said property sold, or any part thereof, deliver possession thereof to said purchaser on production of the referee's deed of said premises."

The Indians in possession of the premises and occupying them refused to leave or vacate and surrender possession, and a writ of assistance was granted by the Supreme Court November 20, 1909, by

virtue of which the sheriff of the county forcibly ejected and removed them against their protest.

Thereafter said Julia Boylan conveyed the premises to defendant Anna Siver Moyer for $1,250, and she gave back a mortgage to secure a part of the purchase price and is now in possession.

[1] No one of the several deeds or conveyances executed and delivered by these Indians in and after 1865 was acknowledged by the grantor before the first judge of Madison county, N. Y., nor was the ˏ·nsent of the superintendent of the Oneida Indians obtained or in-ˏˈursed thereon, as required by section 3 of chapter: 185, Laws of New York, passed April 18, 1843. This act is entitled "An act in relation to the Oneida Indians," and sections 1 to 6, inclusive, read as follows:

"The Oneida Indians owning lands in the counties of Oneida and Madison, are hereby authorized to hold their lands in severalty, in conformity to the surveys, partitions and schedules annexed to and accompanying the treaties made with the said Indians, by the people of this state, in the year one thousand eight hundred and forty-two, and now on file in the office of the secretary of state; and the lots so partitioned and designated by said survey to the said Indians, shall be deemed to be in lieu of all claims and interest of the said Indians, in and to all other lands and property in the Oneida reservation, except the mission lot on lot one, and the church lot on lot two, of the Oneida Purchase, of May 23, 1842, which are to be held by the said Indians as tenants in common.

"Sec. 2. The Governor shall appoint a superintendent of the Oneida Indians, who shall hold his office for the term of two years, subject to be removed for cause.

"Sec. 3. It shall be lawful for the said superintendent of the Oneida Indians, upon application made to him for that purpose, by any Indians or Indian owning lands as aforesaid, to sell and convey such lands to the person or persons so applying, provided the price agreed upon between said Indians or Indian and the said person or persons so applying to purchase said lands, shall, in the opinion of the said superintendent, be not less than a fair and reasonable price therefor; and the said superintendent shall receive, at the time of making such sale, not less than one-fourth of the purchase money in hand, and shall secure the residue by bond and mortgage, payable within four years from the date thereof, with annual interest, to the said superintendent and his successors in office, in trust for the said Indians respectively. A deed of an Indian shall be valid to convey the title of himself, his wife and ·ˈiinor children; and every deed .executed by virtue of this act, shall be acknowledged by the grantor before the first judge of Madison county, and the ˏˈonsent of the superintendent shall be indorsed thereon; and, when so executed and acknowledged and certified, shall be recorded in the county in which said land shall lie, with the same effect as other deeds.

"Sec. 4. The said superintendent shall keep a book, in which he shall open and keep a full account of debt and credit with each Indian for whom he acts and for whom he shall receive any money by virtue of this act, which book shall at all times be open for inspection to all persons; and he shall pay over all money as it shall, from time to time, come to his hands, to the Indian or Indians to whom it may rightfully belong, on demand, deducting therefrom his reasonable charges.

"Sec. 5. The said superintendent shall, with the consent of a majority of the chiefs and head men of the said Indians, sell and convey the above mentioned lots of land, held according to Indian usages, and sanctioned by treaties with them on the part of this state, as the common property of all the Oneidas who did not cede their lands to the people of this state previous to the treaty made with them, March 8, 1841, for a fair price, unto any purchaser or purchasers, by requiring from them cash payments; and the conveyances shall be made, executed and acknowledged by the said superintendent; and the consent of the chiefs and head men in council shall also be acknowledged in

the presence of an officer duly qualified to take acknowledgments of deeds; and such acknowledgments shall be endorsed on such deeds, in the like manner and to the same effect as conveyances mentioned in the third section of this act; and the money arising from the sale of said common lands, after deducting the reasonable expenses incurred in the survey, description and the partition of all lands which are the subject of this act, and of all the expenses in the negotiation and conclusion of the administration of their public affairs, shall be paid by him to the said chiefs and head men.

"Sec. 6. The deeds and conveyances made as aforesaid, shall convey all the right, title and interest of the said Indians, or Indian, whose lands shall have been conveyed as aforesaid, of, in and to the same, and shall vest in the purchaser or purchasers, his or their heirs or assigns forever, an absolute estate of inheritance in fee simple."

This law was repealed by section 113, chapter 679, Laws 1892, and section 125, chapter 31, Laws of 1909 (Consol. Laws, c. 26).

Section 4 of chapter 87, Laws of New York of 1843, reads as follows:

"Any native Indian may, after the passage of this act, purchase, take, hold and convey lands and real estate in this state, in the same manner as a citizen; and whenever he shall have become a freeholder, to the value of one hundred dollars, he shall be liable on contracts, and subject to taxation and to the civil jurisdiction of the courts of law and equity of this state, in the same manner and to the same extent as a citizen thereof."

It seems clear that chapter 185, Laws of New York of 1843, in force until 1892, pointed out the mode and manner by which these Oneida Indians could convey their interest in the lands therein referred to, and which included lot 17, and therefore the lands in question here.

[2] The United States does not claim that it ever owned the fee to this Oneida reservation, of which the lands in question formed a part; but the United States does contend that it had jurisdiction over these Indians: that they were and are "wards of the nation," that is, of the United States; and that it is its right and duty and within its power to protect them in and secure to them their rights, thereby protecting its own rights and interests as guardian of such wards. These Indians were living on their own reservation, and were not living with the whites, nor were the whites living with them. They went abroad to work and earn a living, as they had the right to do, without losing any of their property or tribal rights. They took on no new status. They did not abandon their lands or their status as members of the Oneida Tribe of Indians, one of the Six Nations, with which the United States entered into a treaty November 11, 1794, and by so doing they did not emancipate themselves from the guardianship of state or nation.

It is true that the Oneidas, with the other tribes constituting the Six Nations, except one, the Tuscaroras, were nations of the state of New York, located therein, from the time of the discovery of America, and that the lands occupied by them, and set apart or reserved by them as their reservations, respectively, were within the colony of New York, prior to the Revolutionary War, and that the state of New York was one of the original 13 colonies or states entering into and constituting the United States of America on the recognition of our independence. But these tribes were recognized as independent nations in our Con-

stitution, and have been treated as such, and with them the United States has made treaties under the power conferred by that instrument.

In the "Extra Census Bulletin, Indians—The Six Nations of New York, Cayugas, Mohawks (Saint Regis), Oneidas, Onondagas, Senecas, Tuscaroras," by Thomas Donaldson, expert special agent, and by Henry R. Carrington, which is full of information, and some misinformation, we have a good history of the Six Nations as they were in 1900.

This volume contains portraits of Solomon George, one of the George family, Oneida chief, Henry Powliss, Joshua Jones, and Abram Hill, all Oneidas, and gives their Indian names. This volume states (page 4):

"The conclusion is irresistible that the Six Nations are nations by treaty and law, and have long since been recognized as such by the United States and the state of New York, and an enlightened public will surely hesitate before proceeding to divest these people of long-established rights without their consent—rights recognized and confirmed in some cases by the immortal Washington and by more than a hundred years of precedents and legislation."

In 1890, 106 of the Oneidas remained in Madison and Oneida counties (adjoining), and these retained 350 acres of the reservation; the balance having been sold by treaties of June 28, 1785, September, 1788, September, 1795, June 1, 1798, March 5, 1802, and others later, including the one hereinbefore mentioned. All this may reduce the area of a reservation, and the population may be reduced by death and emigration; but this does not annihilate the reservation, or make independent citizens of those remaining thereon, or deprive them of the character of "wards of the nation." Nor does mere authority granted by the legislation of the state to hold their lands "in severalty" have that effect. In this case we have seen that to convey their interests in these lands by authority of the state it was necessary that the deeds be executed by acknowledging the execution thereof before the first judge of the county and have indorsed thereon the approval of the commissioner whose appointment was provided for, and that this law was in full force when the deeds of these lands were made. Clearly there was no compliance with the statute. If that statute was of any force or validity whatever, up to the time it was repealed in 1892, it was only operative when obeyed, or when its essential terms were complied with. Evidently the state of New York recognized that it was unsafe and unwise to give to these improvident Indians the power to dispose of their lands by sale or mortgage as they saw fit, and when they saw fit, and for such price as they saw fit, or might have imposed upon them.

Can such a statute be ignored by the courts? Was obedience to its mandates merely directory and immaterial? A statute of the state or of the United States is to be read and interpreted as one whole, in so far as the one part has any relation to the other, and if I am capable of understanding the act of April 18, 1843, to make a conveyance of land by one of these Oneida Indians valid, or entitled to be recorded, even, it was necessary for the would-be purchaser to have the consent of the "superintendent of the Oneida Indians" and to have that con-

sent indorsed on the deed, and that the deed should be acknowledged before the first judge of the county. It is apparent these things were to be done for the protection of the Indians from imposition and the results of their own improvidence and ignorance, and were conditions precedent to the transfer of title. I am of opinion Judge Lyon was right in his construction of the statutes, and the results demonstrate the wisdom and necessity of the law for the protection of Indians, as the interests of Mary George, Henry George, William Honyost, and Chapman Schenandoah in these 32 acres of land were eaten up by that partition suit, and they found themselves in debt to the plaintiff, while she became the owner of the property for $675, and shortly sold it for $1,250.

The United States has steadily and uniformly asserted its jurisdiction over the Indians of the "Six Nations," which, as stated, included the Oneida Indians and other New York tribes. The New York Indians, 5 Wall. 761, 770, 8 L. Ed. 708; Fellows v. Blacksmith, 19 How. 366, 370, 371, 15 L. Ed. 684. Georgia was also one of the colonies of Great Britain, and one of the 13 original states. In Worcester v. State of Georgia, 6 Pet. 515, 8 L. Ed. 483, after a careful and exhaustive examination of the relations between the Indian tribes and the United States (not especially the tribes removed beyond the Mississippi to reservations provided for and ceded to them by the United States, but those of the tribes of the original states), it was held that the Indians of these tribes in the original states were wards of the nation, and—

"The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed; and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term 'nation,' so generally applied to them, means 'a people distinct from others.' The Constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth; they are applied to all in the same sense. * * *

"The Cherokee Nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation is, by our Constitution and laws, vested in the government of the United States. * * *

"A reference has been made to the policy of the United States on the subject of Indian affairs, before the adoption of the Constitution, with the view of ascertaining in what light the Indians have been considered by the first official acts, in relation to them, by the United States. * * *

"In this view, perhaps, our ancestors, when they first migrated to this country, might have taken possession of a limited extent of the domain, had they been sufficiently powerful, without negotiation or purchase from the native

Indians. But this course is believed to have been nowhere taken. A more conciliatory mode was preferred, and one which was better calculated to impress the Indians, who were then powerful, with a sense of the justice of their white neighbors. The occupancy of their lands was never assumed, except upon the basis of contract, and on the payment of a valuable consideration.

"This policy has obtained from the earliest white settlements in this country down to the present time. Some cessions of territory may have been made by the Indians, in compliance with the terms on which peace was offered by the whites; but the soil, thus taken, was taken by the laws of conquest, and always as an indemnity for the expenses of the war, commenced by the Indians.

"At no time has the sovereignty of the country been recognized as existing in the Indians, but they have been always admitted to possess many of the attributes of sovereignty. All the rights which belong to self-government have been recognized as vested in them. Their right of occupancy has never been questioned, but the fee in the soil has been considered in the government. This may be called the right to the ultimate domain, but the Indians have a present right of possession.

"In some of the old states, Massachusetts, Connecticut, Rhode Island, and others, where small remnants of tribes remain, surrounded by white population, and who, by their reduced numbers, had lost the power of self-government, the laws of the state have been extended over them, for the protection of their persons and property."

This case frequently has been cited and approved. In United States v. Kagama, 118 U. S. 375, 382, 6 Sup. Ct. 1109, 1113 (30 L. Ed. 228), the court cited Cherokee Nation v. Georgia, 5 Pet. 1, 8 L. Ed. 25, and Worcester v. State of Georgia, supra, and then said:

"In the first of the above cases it was held that these tribes were neither states nor nations, had only some of the attributes of sovereignty, and could not be so far recognized in that capacity as to sustain a suit in the Supreme Court of the United States. In the second case it was said that they were not subject to the jurisdiction asserted over them by the state of Georgia, which, because they were within its limits, where they had been for ages, had attempted to extend her laws and the jurisdiction of her courts over them.

"In the opinions in these cases they are spoken of as 'wards of the nation,' 'pupils,' as local dependent communities. In this spirit the United States has conducted its relations to them from its organization to this time. But, after an experience of a hundred years of the treaty-making system of government, Congress has determined upon a new departure—to govern them by acts of Congress. This is seen in the Act of March 3, 1871, embodied in section 2079 of the Revised Statutes [Comp. St. § 4034]:

" 'No Indian nation or tribe, within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power, with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired.' * * *

"In the case of Worcester v. State of Georgia, above cited, it was held that, though the Indians had by treaty sold their land within that state, and agreed to remove away, which they had failed to do, the state could not, while they remained on those lands, extend its laws, criminal and civil, over the tribes; that the duty and power to compel their removal was in the United States, and the tribe was under their protection, and could not be subjected to the laws of the state and the process of its courts.

"The same thing was decided in the case of Fellows v. Blacksmith and others, 19 How. 366 [15 L. Ed. 684]. In this case, also, the Indians had sold their lands under supervision of the states of Massachusetts and of New York, and had agreed to remove within a given time. When the time came a suit to recover some of the land was brought in the Supreme Court of New York, which gave judgment for the plaintiff. But this court held, on writ of error, that the state could not enforce this removal, but the duty and the power to do

so was in the United States. See also the Case of the Kansas Indians, 5 Wall. 737 [18 L. Ed. 667]; New York Indians, 5 Wall. 761 [18 L. Ed. 708].

"The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

These cases have not been shaken or overruled as authority.

In 1906, when the partition action was commenced, the Oneida reservation still existed, although reduced in area, and what remained was peopled by Indians, quite a number of whom made their home on the premises in question; most of them coming and going, it is true, but this was their home. The title had descended to them from those who occupied the lands when Columbus discovered America, and had never gone out of them. These were not lands conveyed to them, or set apart for them, by the state of New York, from its own possessions. When the "emigrating party" went to Wisconsin, all (both emigrating and home parties) released and ceded certain lots, designated on the map referred to, to the state, and those who emigrated ceded all of the lots not ceded to the state to those Indians who remained, and who had the right to remain, and who lost no rights by remaining. The state recognized this by entering into that compact.

But it is urged that by such treaty or compact those who remained were given the right to hold their lands in severalty, and that thereafter they did. But there was no division amongst themselves; no partition by consent or otherwise. But assume there was an understanding that certain Indians owned the lands they occupied; how could those Indians convey by deed or mortgage in the face of the provisions of the statute quoted? Conditions as to and restrictions on alienation were imposed by the state for their protection, and if not complied with the conveyances were invalid. The question is settled in Tiger v. Western Investment Co., 221 U. S. 286, 316, 31 Sup. Ct. 578, 55 L. Ed. 738, and Heckman v. United States, 224 U. S. 413, 436, 32 Sup. Ct. 424, 56 L. Ed. 820, in both of which cases allotments had been made to individual members of the Cherokee Tribe of Indians "in severalty," but with restrictions on the power of alienation. In the one case, Tiger v. Western Investment Co., supra, the consent of the Secretary of the Interior was required to conveyances by Indians, and it was held that the restriction on alienation applied, notwithstanding the fact the Indians had become citizens and held in severalty, and conveyances without such consent were held void. The same was held in Rainbow v. Young, 161 Fed. 835, 88 C. C. A. 653. In this case the opinion was by Circuit Judge Van Devanter, now of the United States Supreme Court, and was approved in the opinion of the court in United States v. Sutton, 215 U. S. 291, 296, 30 Sup. Ct. 116, 54 L. Ed. 200. Judge Van Devanter said:

"In short, they are regarded as being in some respects still in a state of dependency and tutelage, which entitled them to the care and protection of the national government, and when they shall be let out of that state is for Congress alone to determine."

256 F.—31

In the Tiger Case, supra, the court, approving this, and after citing and approving cases holding the like doctrines, said:

"Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the government, has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage.

"The privileges and immunities of federal citizenship have never been held to prevent governmental authority from placing such restraints upon the conduct or property of citizens as is necessary for the general good. Incompetent persons, though citizens, may not have the full right to control their persons and property."

[3] In the instant case the restriction on alienation by these Oneida Indians of their lands was not imposed by act of Congress, but neither was the right to hold in severalty given by act of Congress. If we assume the state of New York had no authority in the premises, and that the authority was in Congress solely, then there was no right to hold in severalty, and no right of alienation to private individuals whatever. If the state of New York did have jurisdiction and power to make the compact or treaty of May 23, 1842, then it had the right and power to enact chapter 185, Laws of New York of 1843, and the restrictions and conditions imposed on the right of alienation were valid and binding, as we have seen. The authorized grantor of the right to hold in severalty has the right to impose restriction on alienation. The fact these Indians had become citizens, if they had, in no way impairs the force or effect of these restrictions on the power of alienation. Tiger v. Western Investment Co., supra, and Heckman v. United States, 224 U. S. 413, 436, 437, 32 Sup. Ct. 424, 56 L. Ed. 820.

[4] What was the effect of the partition action, and of the final judgment of the Supreme Court of the state of New York directing a sale of these premises, and of the sale made under and pursuant thereto?

If it be true, as said in the decided cases as to other Indians and the Six Nations, that these Oneida Indians were and are the wards of the nation, and that their tribal lands were not subject to the control of the courts of the state, but of Congress, then such judgment and sale had no effect or validity whatever. The court was acting without jurisdiction of the subject-matter of the suit. Jurisdiction of the persons of these Indians gave no jurisdiction of the subject-matter. The statutes of the state of New York had imposed valid restrictions on the sale of these lands by these Oneida Indians, and the conditions imposed were not complied with in any respect and the conveyances to the plaintiff in the partition suit were made while that statute was in force and in utter disregard of its provisions. She took no title, as we have seen, by virtue of those conveyances, and was not a joint owner, or a tenant in common, and had no right of possession in præsenti or in futuro. The same defects are present in the alleged title obtained under the statutory foreclosure by advertisement. If these Indians, after 1843, actually partitioned these lands by agreement, and

this partition by parol was followed by actual possession under it, such partition might be valid, assuming they had been authorized to hold as tenants in common or in severalty. But that is not the question here. The question here is: Did the defendant, Julia Boylan, obtain title to these lands in question through the sale decreed and made and confirmed by the court in that suit?

As already stated, neither the state of New York, nor the United States, nor any of their officers, were made parties to the action of partition and sale, and no guardian ad litem of these Indians, who were made defendants, and whose lands were directed to be sold and were sold, was appointed. If these Indians, who were made defendants, were incompetents prior to the compact or treaty of May, 1842, it seems to me they were incompetents thereafter. When and by what act of the state of New York, or of the United States, or of their own, did they cease to be incompetents, and "wards of the nation" or of the state, and without their consent, as to their ancestral lands and reservation, become subject and liable to be deprived of same by a decree of court to which their guardian, the United States, was not a party, and as to the making of which such guardian was not consulted? Is everything that has been said and decided on this subject since the formation of our government a mockery and a sham? Did the act of the state of New York in procuring a portion of these Indians to emigrate to Wisconsin, procuring those who did emigrate and those who remained to cede to the state certain well-defined parts of their reservation, and those who did emigrate to cede or transfer their interest in the lands not ceded to the state of New York to those who did not emigrate, but remained on the remnant of the Oneida reservation, accompanied by permission of the state to hold same in severalty, make those Indians who did not emigrate—that is, the home party—competent, and change their status from that of wards of the nation to that of citizens of the state of New York, with all the rights of citizens, and subject to all its laws as to their real property so held? Where is the act of Congress or of the Legislature of the state of New York that so declares, even by implication?

For two good reasons that sale of these lands in question made in the partition suit was not and is not valid: First, the plaintiff was not a tenant in common, or joint tenant, and had no interest in such lands; and, second, the suit could not be maintained against these Indians, wards of the nation, and a decree of sale made, as neither the state nor the United States was a party to the suit. That final judgment of sale is in no sense res adjudicata as the parties are not the same.

[5] Thus far we have dealt with this case almost exclusively on the theory that the Indians are wards of the nation, and that the United States has full jurisdiction over them and the disposition of their lands, notwithstanding such lands were a part of the domain of one of the original states of the Union.

We will now look to and consider the action of the state of New York in regard to Indian lands belonging to any nation, tribe, or band of such Indians. Article 1, § 16, of the Constitution of 1846 of the state of New York, provided as follows:

"No purchase or contract for the sale of lands in this state, made since the fourteenth day of October, one thousand seven hundred and seventy-five, or which may hereafter be made, of, or with the Indians, shall be valid, unless made under the authority and with the consent of the Legislature."

This was carried into the Constitution when amended, and will be found in volume 1 of the "Revised Statutes and General Laws of New York," by Birdseye, published in 1896. Section 384a of the Penal Code of the state of New York, and made a part thereof by chapter 692, Laws of 1893, provides as follows:

"A person who without the authority and consent of the Legislature, in any manner or for [or] on any terms, purchases any lands within this state of any Indian residing therein, or makes any contract with any Indian for or concerning the sale of any lands within this state, or gives, sells, demises, conveys or otherwise disposes of any such lands, or any interest therein, or offers so to do, or enters upon or takes possession of or settles upon any such lands, by pretext or color of any right or interest in the same, in consequence of any such purchase, or contract made or to be made, since October 14, 1775, is guilty of a misdemeanor."

Chapter 420, passed April 11, 1849, of the Laws of New York, being an act entitled "An act for the benefit of Indians," provided as follows:

"All nations, tribes or bands of Indians who own and occupy Indian reservations within this state, and hold lands therein as the common property of such nations, tribes or bands, may by the acts of their respective Indian governments, divide such common lands into tracts or lots, and distribute and partition the same, or parts thereof, quantity and quality relatively considered, to and amongst the individuals or families of such nations, tribes and bands respectively, so that the same may be held in severalty and in fee simple, according to the laws of this state; but no lands occupied and improved by any Indian, according to the laws, usages or customs of the nation, shall be set off to any person other than the occupant, or his or her family.

"Sec. 8. In case such distribution or partition be made, the deeds to be made to effect the same shall be made by such officers, agents or commissioners as said governments shall appoint, and the commissioners of the land office shall approve, but before any such deeds be executed, the proceedings and acts authorizing such execution and appointing the parties so to do, shall be authenticated and proved before and to the satisfaction of the county judge of the county in which the lands to be conveyed shall lie, and recorded in the clerk's office of the county.

"Sec. 9. Every deed which shall be executed under and in pursuance of such authority, shall be acknowledged before such county judge by the parties who shall execute it, and said judge shall examine such deeds, and see that they be in due form, and in pursuance of the authority under which they be executed, and indorse on each deed his certificate of such examination and acknowledgment, and such certificate shall authorize the county clerk to record such deeds in the records of deeds for his county.

"Sec. 10. No lands thus distributed and partitioned, shall be alienable by the grantee thereof or the heirs of such grantee for twenty years after the day of the recording of the said deed thereof; but they may be partitioned amongst the heirs of any grantee who shall die. They shall not be subject to any lien in incumbrance by way of mortgage, judgment or otherwise."

This provides a mode and manner of partitioning Indian lands, and there are safeguards around such partitions, and it will be noted that in section 10 it is expressly provided that such lands, when so divided, "shall not be subject to any lien in incumbrance by way of mortgage, judgment or otherwise." These provisions in substance were carried into the Indian Law, and may be found in Birdseye's "Revised Stat-

utes," volume 2, published in 1896, at pages 1488 and 1489. As carried into the Revised Statutes, such lands, when partitioned in the mode and manner provided, were made inalienable by the grantee named in the deed of partition for 20 years after the recording of the deed effecting the partition, but provided that same might be partitioned among the heirs of a grantee who dies. These provisions of the statutes were never complied with, nor was there any pretense of complying therewith.

In 1802 the Congress of the United States enacted what is known as the "Indian Intercourse Act," which invalidates any purchase of lands from Indians unless "made by treaty or convention, entered into pursuant to the Constitution." Act March 30, 1802, c. 13, § 12, 2 Stat. 143.

In the case of the Seneca Nation of Indians v. Christie, 126 N. Y. 122, 27 N. E. 275, the Court of Appeals of this state held that on the declaration of independence the colonies became sovereign states, and as such succeeded to the title of the crown of England to all the ungranted lands within their respective boundaries, with the exclusive right to extinguish by purchase the Indian titles, and to regulate dealings in regard thereto with the Indian tribes, and that the colonies retained this power after the adoption of the federal Constitution. The court also held that the United States could not impair their title, or authorize any purchase of lands within a state, without the consent of the state, and that the provisions of the Constitution of the United States, prohibiting any state from entering into any treaty, etc., does not apply to negotiations or dealings between a state and Indian tribes therein for the extinguishment of the Indian title to land in the state, and that such a treaty is not a treaty in a constitutional sense, and is not inconsistent with the exercise by the United States of its general jurisdiction for the protection of the Indians in their right of occupancy of their lands. It is seen that this case recognizes the general jurisdiction of the United States to protect the Indians in the occupancy of their lands and thereby recognizes the guardianship of the general government over the Indians in the original 13 states.

There is a proviso in the law of Congress referred to, referring to and providing for the presence of a commissioner or commissioners of the United States to propose and adjust with the Indians the compensation to be made for their claims to lands within such state which are to be extinguished by treaty. The Court of Appeals held that this does not require that the treaty should be one between the United States and the tribe from whom the purchase was proposed to be made, and that it is sufficient if the purchase is made at a treaty held under the authority of the United States and in the presence and with the approbation of its commissioner. The court therefore held that the state or its agent was authorized to enter into a treaty or convention with the Indian tribe within its borders for the extinguishment of the Indian title, provided it was entered into in the presence and with the approval of a commissioner of the United States appointed to attend the same. The court also held that the policy of the state of New York has been in full accord with that of the United States in prohibiting all private dealings with and purchases from Indians, ex-

cept under the supervision of public officials and with the consent of the Legislature. See, also, 22 Cyc. 127. See, also, Const. N. Y. 1777, art. 37; Const. 1821, art. 7, § 12; Const. N. Y. 1846, art. 1, § 16.

It is needless to say that the deeds of these Indian lands, made by Indians and which purported to convey the title to the 32 acres of land in question, were made, executed, and delivered in violation and defiance, not only of the act providing for the disposition of lands by the Oneida Indians to which attention has already been called, but of the Constitution of the state of New York and of the act providing for the partition of tribal lands among the members of the tribe. The purchasers of these lands from the Indian occupants were bound to take notice of the fact that such lands constituted a part of the Indian reservation, and were owned by Indians who were members of that tribe, and also of the provisions of the Constitution of the state and the various laws relating to the disposition of lands by Indians and the restrictions thereon. Those conveyances, except the first three, which do not affect this case in the slightest, were not made under the supervision of public officials as provided by law, or with the consent of the Legislature of the state, but in violation of the statute to which attention has been called, and which provided how and when and in whose presence and with whose approval such a conveyance could be made.

The case in the Court of Appeals to which I have called attention does not presume to deny, but in fact recognizes, the general jurisdiction of the Congress of the United States over all the Indians in all the states of the Union who have not abandoned and surrendered their tribal relations and affiliations, and their reservations, and have become a part of the general citizenship of the state where they reside.

In the instant case the evidence conclusively shows that the Indians who made these conveyances had not abandoned their tribal relations and customs, except as all Indians do who approach more or less towards civilization. They were residing on the remaining part of the reservation and making it their home. Their interests therein came by descent from the original proprietors of the soil, who owned and occupied it long before the discovery of America by Christopher Columbus. Neither the state of New York nor the United States had extinguished their title, or attempted so to do. In my judgment, it is of no moment how these Indians dressed. It would be expected that, as they advanced towards civilization, they would adopt more or less some of the customs and the dress of the people of the United States who surrounded them. I cannot conceive how or why their dressing themselves like civilized men and women should in any way affect their rights to and interest in their lands, or in any way tend to validate a deed given by them of their lands. The validity of their deeds of land is made to depend on compliance with certain statutory and constitutional provisions, and not on their mode of dress or means of obtaining a livelihood.

This brings us to the consideration of the all-important question in this case, whether or not the United States can maintain this action for the protection of these Indians. It must be conceded that the

United States is not the owner of the fee to these lands, and never was. It should appear here that the United States government, under a treaty with the Oneida Indians, is paying to the remnants of that tribe each year several thousand dollars worth of goods. It is claimed that this is not done by way of guardianship and protection of these Indians, but as compensation for the loyalty of their ancestors during the Revolutionary War to the cause of the colonies. Whether these goods are paid each year for the one reason or the other, the fact remains that the United States government has and shows an interest in these Indians and aids in their support and maintenance. The United States has an interest in their protection. The interest referred to is not a pecuniary one, as was said by Mr. Justice Hughes in giving the opinion in Heckman v. United States, supra, at page 437 of 224 U. S., at page 431 of 32 Sup. Ct. (56 L. Ed. 820):

"During the continuance of this guardianship, the right and duty of the nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid. While relating to the welfare of the Indians, the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States. A review of its dealings with the tribes permits no other conclusion. Out of its peculiar relation to these dependent peoples sprang obligations to the fulfillment of which the national honor has been committed. 'From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by Congress, and by this court, whenever the question has arisen.' United States v. Kagama, 118 U. S. 375, 384 [6 Sup. Ct. 1109, 30 L. Ed. 228].

"This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust. When, in 1838, patent was issued to the Cherokees, providing that it was subject to the condition that the granted lands should revert to the United States, if the Cherokee Nation became extinct or abandoned them, neither the rights nor the duties of the United States were confined to the reversionary interest thus secured. And its relinquishment made it no less a matter of national concern that the restrictions designed to protect the Indian allottees should be enforced. But this object could not be accomplished if the enforcement were left to the Indians themselves. It is no answer to say that conveyances obtained in violation of restrictions would be void. That, of course, is true, and yet, by means of the conveyances and the consequent assertion of rights of ownership by the grantees, the Indians might be deprived of the practical benefits of their allotments. It was the intent of Congress that, for their sustenance and as a fitting aid to their progress, they should be secure in their possession during the period specified and should actually hold and enjoy the allotted lands. As was well said by the court below: 'If they are unable to resist the allurements by which they are enticed into making the conveyances, will they be expected to undertake the difficult and protracted litigation necessary to set aside their own acts? To ask these questions is to answer them. Congress intended that both the Indians and the members of the white race should obey its limitations. A transfer of the allotments is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States. If these Indians may be divested of their lands, they will be thrown back upon the nation a pauperized, discontented and, possibly, belligerent people.' The authority to enforce restrictions of this character is the necessary complement of the power to impose them."

I think these observations of Mr. Justice Hughes are applicable here. The conditions are somewhat different, but all the same the guardian-

ship recognized by the Court of Appeals of the state of New York still continues, and I cannot see why it is not the duty of the nation to enforce the restrictions designed for the security of the Indians. It is immaterial, in my judgment, whether those restrictions on alienation of their lands was imposed by the state or by the nation. They exist and the conditions have been violated. Mr. Justice Hughes said, to repeat:

"From their weakness and helplessness * * * there arises the duty of protection and with it the power."

If it be true, as it was, that the Oneida Nation of Indians stood as a bulwark to the best of its ability during the Revolutionary War between those tribes who adhered to the crown and the infant colonies, and which fidelity to the cause of the colonies aided to bring about the recognition of the independence of the United States, all the greater is the duty of the United States to now see to it that the remnants of this tribe, whether few or many, have the protection of this government. I cannot understand the argument that this right of protection at the hands of the United States is any the less for the reason those entitled to it are now few in numbers. If the right to protection exists at all, it ought to survive so long as a single Indian entitled thereto invokes it and remains on the reservation, and in my judgment it is entirely immaterial whether that reservation has been reduced from thousands of acres to one or one hundred acres.

It is error to assume that the annual gift made by the United States of cloth, etc., to the Oneida Indians in New York, is in recognition of or payment for their fidelity and services during the Revolutionary War, as we shall see by a reference to the several treaties. In 1846 was published volume 7 of United States Statutes at Large, Indian Treaties, and this volume contains the various Indian treaties made by the United States up to that time. The first treaty was made between the United States and the Delaware Nation September 17, 1778 (7 Stat. 13). This treaty is interesting, but not important here.

The second treaty was made October 22, 1784 (7 Stat. 15), at Ft. Stanwix, on the Mohawk river, in New York, and was between the United States in Congress assembled and the "sachems and warriors of the Six Nations"—Senecas, Mohawks, Onondagas, Cayugas, Oneidas, and Tuscaroras—all named in the treaty. By article I of that treaty six hostages were to be delivered up by the Senecas, Mohawks, Onondagas, and Cayugas, who had been hostile to the United States until the prisoners taken by these nations during the war were delivered up. By article II it was provided:

"The Oneida * * * shall be secured in the possession of the lands on which they are settled."

Article III gives certain boundaries, and defines the western boundaries, and concludes:

"So that the Six Nations shall and do yield to the United States all claims to the country west of said boundary [which boundary was west of Buffalo], and then they shall be secured in the peaceful possession of the lands they inhabit east and north of the same, reserving only six miles square round the fort of Oswego, to the United States, for the support of the same."

The Six Nations then occupied substantially all the lands west of Ft. Stanwix.

January 9, 1789, peace having been declared and the independence of the United States fully recognized, another and a confirmatory treaty (7 Stat. 33) was made between the same parties (except the Mohawks, none of whom attended), which referred to the treaty of Ft. Stanwix, renewed the engagements, confirmed the old boundaries, and confirmed in the Six Nations all their lands, and article 3 said:·

"The Oneida and Tuscarora Nations are also again secured and confirmed in the possession of their respective lands."

This treaty, in article 4, also expressly confirmed and perpetuated the said treaty of Ft. Stanwix. By a separate article, if a crime was committed by an Indian or Indians of the Six Nations, he or they were to be surrendered at the nearest United States post or to the authorities of the state.

November 11, 1794 (confirmed November 17, 1794), another treaty was made between the United States and the Six Nations (7 Stat. 44), all of them, by which, in article I peace and friendship was to be perpetual between them. By article II it is provided:

"The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof; but the said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase."

By article IV, the Six Nations were not to claim other lands in the United States; by article V, the Six Nations ceded the right to the United States to make and maintain a wagon road on their lands; and by article VI, it was provided as follows:

"In consideration of the peace and friendship hereby established, and of the engagements entered into by the Six Nations, and because the United States desire, with humanity and kindness, to contribute to their comfortable support; and to render the peace and friendship hereby established, strong and perpetual, the United States now deliver to the Six Nations, and the Indians of the other nations residing among and united with them, a quantity of goods of the value of ten thousand dollars. And for the same considerations, and with a view to promote the future welfare of the Six Nations, and of their Indian friends aforesaid, the United States will add the sum of three thousand dollars to the one thousand five hundred dollars, heretofore allowed them by an article ratified by the President, on the 23d day of April, 1792, making in the whole $4,500, which shall be expended yearly forever, in purchasing clothing, domestic animals, implements of husbandry, and other utensils suited to their circumstances, and in compensating useful artificers, who shall reside with or near them, and be employed for their benefit. The immediate application of the whole annual allowance now stipulated, to be made by the superintendent appointed by the President for the affairs of the Six Nations, and their Indian friends aforesaid."

By a note it was provided that this annual allowance was to be expended for such members of the Six Nations as should reside within the limits of the United States. In the above is found the provision for

the annual allowance of goods and the consideration and reason therefor.

On December 2, 1794, another treaty (7 Stat. 47) was made between the "Oneida, Tuscarora, and Stockbridge Indians, dwelling in the country of the Oneidas," reciting that during the war these Indians—

"adhered faithfully to the United States, * * * and in consequence" they, "at an unfortunate period of the war, were driven from their homes, and their houses were burned and their property destroyed, and as the United States in the time of their distress, acknowledged their obligations to these faithful friends, and promised to reward them, and the United States being now in a condition to fulfill the promises then made, the following articles are stipulated by the respective parties for that purpose to be in force when ratified by the President and senate:

"Article I. The United States will pay the sum of five thousand dollars, to be distributed among individuals of the Oneida and Tuscarora Nations, as a compensation for their individual losses and services during the late war between Great Britain and the United States."

Articles II, III, and IV then provided for the erection of grist and saw mills and the erection of a church on the lands at Oneida and the employment and payment of men to manage such mills. In consideration thereof, in article V, the Indians acknowledged themselves satisfied and—

"now acknowledge themselves satisfied, and relinquish all other claims of compensation and rewards for their losses and services in the late war."

These treaties or compacts make it perfectly plain that the annual gifts or payments of cloth, etc., made heretofore and still being made by the United States to this remnant of the once powerful tribe of Oneida Indians, and which remnant remains in the state of New York, has nothing whatever to do with compensation for loyalty or services or losses during the Revolutionary War. That was a present payment in full.

Under the treaties certain of the Indians of the Six Nations, prior to 1838, including certain of the Oneidas and Onondagas, had removed to Wisconsin, in the vicinity of Green Bay; but certain of them had remained in New York on their respective reservations—the Onondagas on the Onondaga reservation, which is south of the city of Syracuse, and the Oneidas on the Oneida reservation, south of Oneida, and partly in Madison county (including the lands in question). The Oneidas had divided into three parties, known as "the Orchard party" and the "First" and "Second Christian parties." Hence the reference in certain treaties to these parties.

January 15, 1838 (7 Stat. 550), a treaty or compact was entered into between the United States and "the chiefs, head men and warriors of the several tribes of New York Indians assembled in council," known as "the New York Indians." This was amended and ratified by the United States Senate June 11, 1838. This treaty provided for the ceding of certain lands in Wisconsin by the Indians to the United States, and in consideration thereof for the setting apart of certain lands west of Missouri by the United States to the Indians, viz.:

"Senecas, Onondagas, Cayugas, Tuscaroras, Oneidas, St. Regis, Stockbridges, Munsees and Brothertowns residing in the state of New York."

This treaty made special provision for the Oneidas residing in the state of New York, viz.:

"The United States will pay the sum of $4,000, to be paid to Baptista Powlis, and the chiefs of the First Christian party residing at Oneida, and the sum of $2,000 shall be paid to William Day, and the chiefs of the Orchard party residing" at Green Bay, "for expenses incurred and services rendered in securing the Green Bay country, and the settlement of a portion thereof; and they hereby agree to remove to their new homes in the Indian Territory, as soon as they can make satisfactory arrangements with the Governor of the state of New York for the purchase of their lands at Oneida." Article 13.

February 3, 1838 (7 Stat. 566), a treaty or compact was made between the United States and the First Christian and Orchard parties of the Oneidas then residing at Green Bay, Wis., which in no way related to lands or Indians in the state of New York. These various treaties and compacts show the continued guardianship and jurisdiction exercised by the United States over the Oneida Indians—those who had removed to Wisconsin and those who remained in New York at Oneida prior to the treaty of 1842.

March 3, 1871 (see section 2079, R. S. U. S.), Congress provided that "no Indian nation or tribe within the territory of the United States" should be recognized as an independent nation, tribe, or power with whom the United States might contract by treaty, but at the same time it provided that all existing treaties, etc., should be recognized and should in no wise be impaired by the act. This left the treaties referred to in full force. See Lone Wolf v. Hitchcock, 187 U. S. 553, 566, 23 Sup. Ct. 216, 47 L. Ed. 299.

By chapter 3 of the Revised Statutes of the United States, sections 2111 to 2126 (Comp. St. §§ 4095–4118), provision was made generally for the "government and protection of Indians." Section 2116 (section 4100) relates to sales by Indians of their lands, and says:

"No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution."

In Franklin v. Lynch, 233 U. S. 269, 271, 34 Sup. Ct. 505, 506, 58 L. Ed. 954, as in Gritts v. Fisher, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928, this provision came under consideration and it was held:

"As the tribe could not sell, neither could the individual members, for they had neither an undivided interest in the tribal land nor vendible interest in any particular tract."

Here, even if under the treaty these Oneida Indians held as tenants in common, they were subject to the restrictions as to mode and manner of making conveyances, and such conditions were not complied with. Section 2103 (section 4087) related to contracts with Indians, and this section is applied and enforced in Green v. Menominee Tribe, 233 U. S. 559, 34 Sup. Ct. 706, 58 L. Ed. 1093. The United States still exercises and enforces its jurisdiction over the Indians in the state of New York on reservations as to trafficking in intoxicating liquors and in other respects; and see Act Cong. March 3, 1885, c. 341, § 9, 23 Stat. 362, 385 (Comp. St. § 10502).

[6] I cannot find that the United States has ever conferred on these Oneida Indians the right to hold the lands of that reservation in severalty, or to mortgage or incumber same, or that the state has conferred any such power, unless it be under and subject to the restrictions named and hereinbefore pointed out. I am unable to find any authority which would enable one member of such tribe to sell and convey his interest in the reservation to an outsider, and confer in such purchaser the right to partition and sell in partition, or have sold in such an action, these Indian lands held by several of the tribe in common. I find no law which will sanction a sale of such lands, so owned and held, in a partition action brought by any person. Neither the laws of the United States nor the laws of the state of New York recognize such a mode of extinguishing the rights and title of the Indians in such reservation.

It appears that the attempted sales of their interests in these lands made by the Indians, as above stated, were contrary to and in violation of the policy of both the United States and the state of New York, and also contrary to and in violation of the statutes of both these sovereignties. The Indians did not own the ultimate fee, which is probably in the state of New York. Clark et al. v. Smith, 13 Pet. 195, 201, 10 L. Ed. 123; Fletcher v. Peck, 10 U. S. (6 Cranch) 87, 141, 3 L. Ed. 162.

I am of the opinion, and conclude, that while the United States does not own the fee to the lands in question, and never did, the United States has such an interest as enables it to maintain this action and restore to these wards of the nation, for whose benefit this action is brought, the possession of the lands from which they were wrongfully ejected and removed in violation of the laws of both the state of New York and of the United States. Heckman v. United States, 224 U. S. 413, 438, 32 Sup. Ct. 424, 56 L. Ed. 820; United States v. Kagama, 118 U. S. 375, 384, 6 Sup. Ct. 1109, 30 L. Ed. 228; United States v. Rickert, 188 U. S. 432, 437, 444, 23 Sup. Ct. 478, 47 L. Ed. 532; United States v. Noble, 237 U. S. 74, 79, 35 Sup. Ct. 532, 59 L. Ed. 844; United States v. Nice, 241 U. S. 591, 597, 36 Sup. Ct. 696, 60 L. Ed. 1192; United States v. Gray, 201 Fed. 291, 293, 119 C. C. A. 529; United States v. Fitzgerald, 201 Fed. 295, 296, 119 C. C. A. 533; United States v. Debell et al., 227 Fed. 760, 764, 142 C. C. A. 284; Bowling v. United States, 233 U. S. 528, 534, 34 Sup. Ct. 659, 58 L. Ed. 1080; United States v. Waller, 243 U. S. 452, 462, 37 Sup. Ct. 430, 61 L. Ed. 843.

In the case last cited, United States v. Waller, while it was held that in that case the action could not be maintained by the United States, it was expressly stated at pages 462 and 463 of 243 U. S., at page 433 of 37 Sup. Ct. (61 L. Ed. 843) that—

"In Heckman v. United States, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, it was held that the United States could maintain a bill to cancel conveyances made by members of the Cherokee Nation in violation of restrictions imposed by acts of Congress."

This recognized the authority of that case. The court then went on to say in the Waller Case that with respect to the lands in question the United States had no interest in or control over them, having granted

to the Indians, under what is know as the Clapp Amendment (Act March 1, 1907, c. 2285, 34 Stat. 1015), found on page 461 of the case (37 Sup. Ct. 432, 433), full and specific power to alienate such lands and gives good title. Having expressly given to the individual Indians, to whom such lands had been allotted in severalty, full power to alienate and convey them, no restrictions or conditions whatever being imposed, and such power to convey having been exercised, it would seem almost impossible to contend that the United States could question the validity of the conveyances so authorized.

In Bowling v. United States, supra, the holdings were:

"The guardianship of the United States over allottee Indians does not cease upon the making of the allotment and the allottee becoming a citizen of the United States. Tiger v. Western Investment Co., 221 U. S. 286 [31 Sup. Ct. 578, 55 L. Ed. 738].

"The United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed. Heckman v. United States, 224 U. S. 413 [32 Sup. Ct. 424, 56 L. Ed. 820].

"A transfer of allotted lands contrary to the inhibition of Congress is a violation of governmental rights of the United States arising from its obligation to a dependent people, and no stipulations, contracts, or judgments in suits to which the United States is a stranger can affect its interest.

"The authority of the United States to enforce a restraint lawfully created by it cannot be impaired by any action without its consent."

In the Bowling Case the act of Congress (Act March 2, 1889, c. 422, 25 Stat. 1013) allowing the allotment and providing for the issuance of patents to the individual Indians provided that "the land so allotted shall not be subject to alienation for twenty-five years from the date of the issuance of the patent therefor," and the land was exempted from taxation, and the patent was to recite the restrictions, etc. The alienation was made by the heirs of the Indian to whom the allotment was made, he having died. It was held that the restrictions on alienation ran with the land, and bound the heirs as well as the allottee; that it was not a mere personal restriction operative only on the allottee. However, in the opinion Mr. Justice Hughes, giving same, said:

"It is contended by the appellants that when the allotment was made, and the allottee became a citizen of the United States, the guardianship of the government ceased. But this contention is plainly untenable. Tiger v. Western Investment Co., 221 U. S. 286 [31 Sup. Ct. 578, 55 L. Ed. 738]. And it is no longer open to question that the United States has capacity to sue for the purpose of setting aside conveyances of lands allotted to Indians under its care, where restrictions upon alienation have been transgressed. Since the decision below [in the Bowling Case], the precise question has been determined by this court in Heckman v. United States, 224 U. S. 413 [32 Sup. Ct. 424, 56 L. Ed. 820], and it was there held that the authority to enforce restrictions of this character is the necessary complement of the power to impose them."

If, then, the Congress of the United States had the power to impose restrictions on the alienation by the Oneida Indians of their lands, it has the power to enforce them. The right of the United States to enforce restrictions on the alienation of their lands by Indians does not depend on ownership by the United States of an interest in such lands, or on

the fact it once did own an interest therein and imposed a restriction on alienation when it made the grant or allotment to the Indians. When the United States sets apart a portion of its domain for occupancy by the Indians, that right of occupancy and its duration depend on the terms of the treaty. When Congress authorizes such lands to be held in severalty by such Indians, and directs that patents issue, it has the right to impose such restrictions on alienation by the patentees as it sees fit. By virtue of such fact, and of the relation of guardian and ward, the United States in its own name may enforce such restrictions, and protect such Indians from the consequences of their own incapacity and also from imposition. Such is the right of the United States and such is its duty as we have seen. It is not necessary that the Indians or Indians concerned be made parties. It has repeatedly been decided that the Constitution of the United States conferred jurisdiction over the Indian tribes and their property in the several states of the Union, and this jurisdiction was exercised as we have seen. It was never successfully denied.

The state of New York, in dealing with the tribes remaining wholly or partly in the state, has recognized and still recognizes this right of the general government, and the state has also imposed restrictions on alienation of lands by such Indians. By whom are such restrictions to be enforced, if not by the guardian of such Indians, the United States? This is but the exercise of a governmental right of the United States to enforce a restriction made for the benefit and protection of wards of the nation, and it matters not by whom the restriction or provision for their benefit was made provided it was lawfully done. The guardian of an incompetent is the one to enforce the right and protect him or her in the enjoyment of his or her rights, no matter by whom such rights were conferred. Neither the United States nor the state of New York was a party to the partition suit, and same is of no force or effect. Bowling v. United States, supra.

United States v. Nice, 241 U. S. 591, 601, 36 Sup. Ct. 696, 60 L. Ed. 1192, expressly overrules Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, and holds:

(1) That the allotment of lands to Indians to hold and own in severalty does not dissolve the tribal relation or release the Indians from the control of the Congress of the United States.

(2) That it is for Congress, and not the courts, to say when the tribal existence shall be deemed to have terminated.

(3) That when Congress terminates the tribal relation it does so in express terms, and not by implication.

(4) The grant of citizenship does not terminate the tribal status, and he remains an Indian and an Indian ward as well.

Applying these principles to the instant case, we must conclude that Congress has not terminated the tribal relation of these Oneida Indians, has not conferred on them citizenship, has not authorized them to hold their lands in severalty, but, if it has, the tribal relation continues; that the United States has not authorized or empowered them to sell and convey their lands except under restrictions; that the state

of New York had no power to do these things; and that such Oneida Indians remain Indians and wards of the United States.

In the act of March 3, 1885 (chapter 341). Congress not only continues and provides for the payment of the New York Indian agency, but recognizes the existence and obligations of the treaty of November 17, 1794, and provides for the payment of the annuity therein and thereby agreed to be paid to the Six Nations of New York, and then in section 9 of such act provides for the trial of all Indians committing any of the crimes enumerated in such section within any territory of the United States, and then says:

"And all such Indians committing any of the above crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States."

In Choctaw Nation v. United States, 119 U. S. 1, 27, 7 Sup. Ct. 75, 90 (30 L. Ed. 306) the court reiterates and approves what was said in United States v. Kagama, 118 U. S. 375, 383, 6 Sup. Ct. 1109, 1114 (30 L. Ed. 228):

"These Indian tribes are the wards of the nation. They are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection."

Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643, cited by the defendants, has nothing whatever to do with the Oneida Indians, or their ownership of or right to alienate their lands, but does show that the Indians in question here are not citizens. It is true that Mr. Justice Gray cites a revenue case decided by Judge Wallace some years ago and some of the remarks made by him in that case. The statute of the state of New York (Laws of 1843, chapter 87) referred to by Mr. Justice Gray never had any application to the Oneida Indians, as the mode and manner in which and the restrictions under which they were to convey their lands were specified in another act of the Legislature enacted at the same session, and these restrictions on alienation have been pointed out and both statutes quoted. So one of the many errors of the legislative committee appointed to investigate Indian affairs and report thereon has been pointed out. I am not convinced that the several treaties, between the Oneida Indians, one of the Six Nations, and the United States, were and are mere scraps of waste paper and have no validity; so of the statutes relating to the government of Indians both in the original 13 states and the territories owned exclusively by the government.

The defendants have not claimed that the conveyances made by these Indians complied with the statutes of the state of New York as to their execution, etc. The state of New York never removed those restrictions and limitations, or validated the conveyances. For that reason Julia Boylan never had any title or interest in the lands which would enable her to maintain partition. The United States was not a party

to the partition suit, and is not bound thereby, and hence, within the numerous cases, if the United States retains its guardianship over these Indians, it may maintain this action.   I fail to find any evidence that the United States has ever surrendered such guardianship.   On the other hand, it is still engaged in carrying out its treaty obligations with those remaining in New York and those who removed to the West.

I am of the opinion, and hold, that the United States and the remnants of these Oneida Indians still maintain and occupy towards each other the relation of guardian and ward, and that the United States may maintain this action; also that the partition action and judgment and decree of sale made therein, and above mentioned, was and is void so far as the United States and the ejected Indians are concerned, and that such Indians were wrongfully ejected and removed from the lands described therein and in the complaint in this action.   It is not doubted that the state of New York could obtain title to these lands; that is, obtain and extinguish the right of occupancy which belongs to the Indians, the ultimate fee being in the state, but it has never done so.   And the state has never conferred the absolute and unrestricted right on these Indians to convey these lands.   The restrictions on alienation were valid, and have not been complied with.

There will be a decree declaring such conveyances of these lands and the judgment of sale in the partition action null and void, and directing the restoration of the ejected Indians to the possession thereof.   Under all the circumstances, no costs will be imposed.